**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

MISSISSIPPI BANKERS ASSOCIATION,
409 W. Parkway Pl.,
Ridgeland, MS 39157

CONSUMER BANKERS ASSOCIATION,
1225 New York Ave., NW, Suite 1100
Washington, D.C. 20005

AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave. NW,
Washington, DC 20036

AMERICA'S CREDIT UNIONS
4703 Madison Yards Way, Suite 300
Madison, WI 53705

ARVEST BANK
75 North East Street
Fayetteville, AR 72701

BANK OF FRANKLIN
9 Main Street
Meadville, MS 39653

THE COMMERCIAL BANK
P.O. Box 217
175 Hopper Avenue
DeKalb, MS 39328

   *Plaintiffs*,

    v.

CONSUMER FINANCIAL PROTECTION
BUREAU and ROHIT CHOPRA in his
official capacity as Director of the CFPB,
1700 G. St. NW, Washington, DC 20552

   *Defendants.*

Civil Action No.: <u>3:24-cv-792</u>-CWR-LGI

1

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Mississippi Bankers Association, Consumer Bankers Association, American Bankers Association, America's Credit Unions, on behalf of their members, as well as Arvest Bank, Bank of Franklin, and The Commercial Bank, by and through their undersigned counsel, allege as follows:

## INTRODUCTION

1.    This lawsuit challenges the Consumer Financial Protection Bureau's ("CFPB") Final Rule titled Overdraft Lending: Very Large Financial Institutions ("Final Rule").  The Final Rule purports to rely primarily on the Truth in Lending Act ("TILA"), a statute regarding disclosure obligations for credit products, to impose an expansive and complex new regulatory regime on overdraft services offered by large financial institutions, replete with *de facto* price caps and significant restrictions on the terms under which the services can be offered.  But TILA in no way supports the Final Rule.  Most fundamentally, overdraft services are not "credit," as customers do not have a right to incur overdrafts or defer repayment of the overdraft; as such, they cannot be regulated under TILA.  Moreover, the CFPB far exceeds the disclosure-related scope of TILA by imposing price caps and significant substantive restrictions on the terms under which these services can be offered.

2.    For decades, banks, credit unions, and other financial institutions—large and small—have offered overdraft services to their customers.  Financial institutions retain discretion to pay or decline items that would overdraw a customer's account in exchange for a fee disclosed in the customer's account agreement.  Such agreements do not require financial institutions to cover overdrafts or give customers the right to defer payment of overdraft amounts.

3.    Discretionary overdraft services provide a significant benefit when consumers overdraw their accounts.  For consumers who may have no or limited access to credit, the service

2

can provide a financial lifeline.  Discretionary overdraft programs may allow these consumers to complete essential financial transactions, and thereby buy food at the grocery store, put gas in their car to get to work, or pay their rent, utilities, or car payments when they have a shortfall of funds. As set forth in more detail below, surveys confirm that consumers understand they will be charged a fee if they overdraft and appreciate the option to do so; consumers who have difficulty accessing credit in particular view overdrafting as the best alternative for them and worth the fee.  Absent such programs, these consumers would be forced to turn to expensive non-financial institution alternatives, such as payday loans or loan sharks, or incur costlier late fees and suffer more severe consequences like a decreased credit score, missing work, repossession, or eviction.

4.     For over 40 years, the Board of Governors of the Federal Reserve System ("Board"), the agency charged with enforcement of TILA from its enactment in 1968 until 2010, consistently concluded that the practice of covering a charge on an overdrawn checking account as a courtesy, within the discretion of the financial institution, lacks the hallmarks of a credit transaction as defined by the statute and, therefore, is excluded from the credit disclosure requirements of TILA.  When Congress transferred regulatory authority from the Board to the CFPB in 2010, that agency re-promulgated Regulation Z—the implementing regulation for TILA—without substantive change and the provisions relevant here remained unchanged for the next 14 years.  From the time of the statute's enactment more than 55 years ago, then, the prevailing reading of TILA has been that it does not confer authority to regulate discretionary overdraft services.  That reading of TILA, adopted by courts and agencies alike, has been reaffirmed repeatedly by the Board, including as recently as 2009.  Congress has not seen fit to change this interpretation, despite numerous major substantive amendments to TILA over the years.

5.      That does not mean that overdraft programs have been unregulated. The Board utilized Regulation DD (implementing the Truth in Savings Act) and Regulation E (implementing the Electronic Fund Transfer Act) to regulate overdraft services over the decades. Indeed, in 2009, the Board specifically chose to implement an opt-in requirement for overdraft programs under Regulation E, rather than Regulation Z, because discretionary overdraft services lack a "credit feature." Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,055 (Nov. 17, 2009). The CFPB has acknowledged this history in its published rules. *E.g.*, Prepaid Accounts, 81 Fed. Reg. 83,934, 83,950–52 (Nov. 22, 2016).

6.      The CFPB's Final Rule, which Plaintiffs challenge here, overturns that half century of consistent interpretation. The Final Rule applies only to financial institutions with total assets of $10 billion or more (termed "Very Large Financial Institutions," or "VLFIs" in the Final Rule). For these VLFIs, the Final Rule amends Regulation Z to provide that discretionary overdraft services are an extension of credit, thus requiring a number of disclosures and protections under TILA if a financial institution charges overdraft fees above a $5 price cap set by the Final Rule or above each financial institution's so-called "breakeven" cost, a misnomer if ever there was one, given that the CFPB's rule takes an unduly narrow view of what counts as a "cost." The Rule additionally defines as "finance charges" overdraft fees charged by VLFIs in an amount over these fee thresholds. Although the CFPB claims in its press release announcing the Final Rule to "close[] the large bank regulatory loophole that exempted overdraft fees as a finance charge," the reality is that there is no loophole because overdraft services do not meet the definition of "credit" under TILA, and overdraft fees do not meet TILA's definition of a "finance charge." Those Very Large Financial Institutions that charge above the $5 fee cap or "breakeven" cost must also comply with

complex, burdensome restrictions on overdraft services, and must evaluate whether the consumer qualifies for credit—which may leave consumers who do not qualify nowhere to turn.

7.    The Rule is flawed for several reasons.  Most fundamentally, it exceeds the CFPB's regulatory authority under TILA.  Nothing in TILA suggests that overdraft services are "credit," a term defined by the statute as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."  15 U.S.C. § 1602(f).  Since 1969, discretionary overdraft programs have not been considered "credit" under TILA because customers have no "right" to overdraw their accounts, i.e., no right to "incur a debt," and no "right" to retain the funds the financial institution covered, i.e., no right to "defer payment of debt."  Unlike overdraft lines of credit that are governed by separate credit agreements, financial institutions have the discretion to pay or not pay items that would overdraw an account.  And financial institutions have the right under their account agreements to immediately recoup the amount paid and the accompanying fee by deducting funds from the account balance as soon as it is replenished.

8.    Additionally, the CFPB's rulemaking authority extends *no further* than what is "necessary and proper to effectuate the purposes" of TILA.  15 U.S.C. § 1604(a).  That purpose, as relevant here, is to "assure a meaningful disclosure of credit terms" in order to protect consumers from "inaccurate and unfair credit . . . practices."  15 U.S.C. § 1601(a).  Courts have uniformly held that TILA is "only a disclosure statute and does not substantively regulate consumer credit but rather requires disclosure of certain terms and conditions of credit[.]"  *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1120 (9th Cir. 2009) (citations and quotation marks omitted).  TILA's legislative history is "consistent with the language of the statute limiting its scope to disclosure."  *Id.* (citations omitted).  In the Final Rule, the CFPB improperly relies on its authority

to further TILA's *disclosure* purposes as a means of imposing complex *substantive* changes, including fee caps and creation of separate "credit" accounts.

9.      To make matters worse, the CFPB acted arbitrarily and capriciously by failing to consider the costs and benefits associated with the Rule, and by making the definition of credit hinge on the financial institution's size and "breakeven cost," rather than the nature of the charge. A regulation is arbitrary and capricious if the agency failed to consider an important aspect of the problem.   "That includes, of course, considering the costs and benefits associated with the regulation."  *Chamber of Commerce of United States v. SEC*, 85 F.4th 760, 776 (5th Cir. 2023) (internal quotation marks and citations omitted).  As part of this cost-benefit analysis, the CFPB must consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule."  12 U.S.C. § 5512(b)(A)(i).

10.      The CFPB acknowledges the numerous ways in which the Final Rule could harm consumers by decreasing the availability of overdraft services, but claims it lacked data to quantify the harm and thus offers nothing more than a cursory explanation that the Rule could "lead to evolving industry dynamics with uncertain benefits and costs."  Final Rule at 240.  As detailed below, however, evidence does exist, and was available to the CFPB.  According to a recent survey, an overwhelming percentage of financial institutions subject to the Rule indicated they would substantially reduce overdraft liquidity for consumers if the CFPB imposed a fee cap.  Other data show that consumers who use discretionary overdraft services the most—namely, consumers who disproportionately lack access to credit—will be hit hardest and forced to resort to more expensive or damaging alternatives to complete transactions because they will not qualify for credit.

11.     Over the years, financial institutions have innovated to offer a wide variety of features for overdraft services at a range of price points, and consumers can choose the financial institution and the type of account that best suits their needs.  For instance, many financial institutions now provide grace periods, de minimis overdraft thresholds, and email or text alerts to reduce the number of overdraft fees consumers incur, and offer low- or no-cost overdraft services for certain types of accounts.  The Final Rule, which makes it costlier and more difficult for financial institutions to provide overdraft services, will harm the very consumers the CFPB purports to benefit.

12.     The choice of confining the new rule to financial institutions with assets above $10 billion and making a distinction between discretionary overdraft fees priced above and below "breakeven cost," is also arbitrary and capricious.  The distinction between overdraft fees that exceed or fall below some breakeven amount is utterly arbitrary and has no support in either the purpose of TILA or its text, which defines the term "finance charge" to mean "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit."  15 U.S.C. § 1605(a). Neither TILA nor Regulation Z makes a "finance charge" contingent on the dollar amount of the fee or the asset size of the financial institution, and the CFPB offers no explanation as to how these are appropriate "exemptions" from the definition of a finance charge.

13.     The Final Rule has an effective date of October 1, 2025.  Although it applies only to institutions with assets above $10 billion, the imposition of a $5 fee cap or an unduly constrained "breakeven" cost on overdraft fees for VLFIs will undoubtedly have ripple effects across the industry, including on smaller financial institutions.  Yet the CFPB denies even needing to conduct an analysis as to any impact on smaller financial institutions, thereby disregarding the requirement

under the Regulatory Flexibility Act ("RFA") that an agency prepare an initial regulatory flexibility analysis and convene a panel of small business representatives when it proposes a rule that will impact "small entities."  5 U.S.C. § 603.

14.    Statutes have a "single best meaning."  It is the province of the courts—not agencies—to decide that meaning.  The CFPB's radical redesign of Regulation Z, without statutory authority, reversing an interpretation of TILA in effect since shortly after TILA's enactment in 1968, is a textbook example of administrative overreach.  It is also a case study in arbitrary rulemaking, given the failure to quantify costs and benefits and the unprincipled line-drawing around asset size and breakeven costs.  This is not a close call.  The Final Rule is not in accordance with law and should be vacated.

## PARTIES

15.    Plaintiff Mississippi Bankers Association ("MBA") is a private membership organization representing banks and savings institutions in the State of Mississippi.  The MBA represents its members in legislative and regulatory matters, and also sponsors and endorses products and services for banks.  The MBA's members include financial institutions with assets in excess of $10 billion, as well as a significant number of financial institutions holding under $10 billion in assets.  Many of these members—both large and small—offer discretionary overdraft services and are adversely affected by the Final Rule.

16.    Plaintiff Consumer Bankers Association ("CBA") is the only national trade association focused exclusively on retail banking.  Established in 1919, the association is a leading voice in the banking industry, representing members who employ nearly two million Americans, extend roughly $3 trillion in consumer loans, and provide $270 billion in small business loans. Part of its mission includes representing its members in various government settings.  The CBA's

members include numerous banks providing discretionary overdraft services that are adversely affected by the Final Rule, including banks with over $10 billion in assets.

17.    Plaintiff American Bankers Association ("ABA") is the voice of the nation's $24.2 trillion banking industry, which is composed of small, regional, large, and very large banks over $10 billion in assets that together employ approximately 2.1 million people, safeguard $19.1 trillion in deposits, and extend $12.6 trillion in loans.  The ABA advocates for banks before Congress, regulatory agencies, and the courts to drive pro-growth policies and help customers, clients, and communities thrive.  The ABA's members include large, medium, and small banks across the country that provide deposit services, including discretionary overdraft services, many of which are subject to and adversely affected by the Final Rule.

18.    Plaintiff America's Credit Unions represents our nation's nearly 5,000 federally- and state-chartered credit unions that collectively serve over 140 million consumers with personal and small business financial service products.  America's Credit Unions delivers strong advocacy, resources, and services to protect, empower and advance credit unions and the people they serve. It advocates for responsible legislative policies and regulations so credit unions can efficiently meet the needs of their members and communities.  America's Credit Unions' members include credit unions of all asset sizes across the country that will be adversely affected by this Final Rule, including credit unions above $10 billion in assets.

19.    Plaintiff Arvest Bank ("Arvest") is a state-chartered bank headquartered in Fayetteville, Arkansas, with full service branches in Arkansas, Oklahoma, Missouri, and Kansas. Arvest currently has assets in excess of $10 billion and is classified as a very large financial institution under the Final Rule.  Arvest provides a wide range of affordable products and services to its customers, including discretionary overdraft services, which Arvest has priced at $17 for

decades.  Arvest would be adversely affected by the Final Rule in several ways.  The compliance costs and technology programming requirements needed to conform Arvest's overdraft program to the Final Rule's requirements outside the safe harbor price cap would be time-consuming and are likely cost-prohibitive.  In order to offer discretionary overdraft services at the CFPB's $5 fee cap, Arvest will likely have to overhaul its account offerings and business strategy.  This includes changing the types of accounts if offers and restricting the terms under which discretionary overdraft services are offered to Arvest customers.  Arvest has already incurred, and will continue to incur, substantial costs in order to comply with the Final Rule.  These costs relate to, among other things, analyzing the Proposed Rule and Final Rule, making operating system changes, and revising policies and procedures.

20.    Plaintiff Bank of Franklin is a state-chartered bank headquartered in Meadville, Mississippi, with multiple full-service branches located throughout this District.  Bank of Franklin currently has assets of approximately $234 million.  Bank of Franklin provides a wide range of banking services to its customers, including discretionary overdraft services.  Although Bank of Franklin is not considered a Very Large Financial Institution under the Final Rule, it expects to be negatively impacted by the Final Rule.  Specifically, the Final Rule's $5 fee cap will likely result in significant downward pressure on the market price of discretionary overdraft services, such that Bank of Franklin would be compelled to change the types of accounts it offers and restrict the terms under which discretionary overdraft services are offered to its customers.

21.    The Commercial Bank is a state-chartered bank headquartered in DeKalb, Mississippi, with multiple full-service branches located throughout this District.  The Commercial Bank currently has assets of approximately $260 million.  The Commercial Bank provides a wide range of banking services to its customers, including discretionary overdraft services.  Although

The Commercial Bank is not considered a Very Large Financial Institution under the Final Rule, it expects to be negatively impacted by the Final Rule.  Specifically, the Final Rule's $5 fee cap will likely result in significant downward pressure on the market price of discretionary overdraft services, such that The Commercial Bank would be compelled to change the types of accounts it offers and restrict the terms under which discretionary overdraft services are offered to its customers.

22.     Defendant CFPB is an independent bureau within the Federal Reserve system that implements and enforces federal consumer financial laws.  Rohit Chopra serves as the Director of the CFPB and is named in his official capacity only.

## JURISDICTION AND VENUE

23.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives this Court jurisdiction over all civil actions "arising under the Constitution, laws or treaties of the United States."  Plaintiffs' claims raise federal questions under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and the Court is authorized to issue the relief sought pursuant to the APA.

24.     Venue is proper in this District under 28 U.S.C. § 1391(e) because Plaintiffs MBA, Bank of Franklin, and The Commercial Bank reside in this District, and members of the MBA who are affected by the Final Rule are headquartered in and/or do business in this District.

25.     Each of the Plaintiffs MBA, CBA, ABA, and ACU has members who have assets in excess of $10 billion and who offer discretionary overdraft services and will thus be subject to—and injured—by the fee caps and burdensome regulatory restrictions imposed by the Final Rule.  Given the significant scale and complexity of the Final Rule and its October 1, 2025 effective date, Very Large Financial Institutions must begin preparing to comply immediately; thus, they must begin incurring substantial costs now that will be unrecoverable in the event the

Final Rule is vacated. These costs include, but are not limited to, assessing their "breakeven" cost of discretionary overdraft services, reprogramming deposit operating systems, amending overdraft policies and procedures, creating disclosures, and hiring personnel to conduct underwriting. Financial institutions have already spent substantial time and resources to analyze the Proposed Rule, will have to do the same for the Final Rule, and must assess the Final Rule's effect on their existing deposit systems and service offerings.

26.    The MBA, CBA, ABA, and America's Credit Unions have members that would otherwise have standing to sue in their own right. *See Ass'n of Am. Physicians & Surgeons, Inc v. Tex. Med. Bd.*, 627 F.3d 547, 550–51 & n.2 (5th Cir. 2010). One of the MBA's purposes is to represent its member banks and savings institutions in judicial regulatory matters. The CBA's mission includes representing retail banking industry members in various government settings in order to promote sound policy. The ABA's purpose is to advocate for banks before regulatory agencies and courts to drive pro-growth policies and help customers, clients, and communities thrive. The purpose of the America's Credit Unions is to protect, empower and advance credit unions and the people they serve. In this litigation, these organizations seek to protect their interests in helping member financial institutions expand consumers' opportunities and choices by providing a wide variety of deposit account services with innovative features. This is germane to the Plaintiffs' purposes and confers associational standing. *See id.*

27.    Arvest Bank, Bank of Franklin, and The Commercial Bank have standing to sue in their own right.

## STATUTORY AND REGULATORY BACKGROUND

### A.    The Truth in Lending Act ("TILA")

28.    By the time of TILA's passage in 1968, "it had become abundantly clear" to Congress "that the use of consumer credit was expanding at an extremely rapid rate." *Mourning*

*v. Family Publ'n Servs., Inc.*, 411 U.S. 356, 363 (1973) (summarizing TILA's legislative backdrop). "Yet, as [ ] congressional hearings revealed, consumers remained remarkably ignorant of the nature of their credit obligations and of the costs of deferring payment." *Id.* "Because of the divergent, and at times fraudulent, practices by which consumers were informed of the terms of the credit extended to them, many consumers were prevented from shopping for the best terms available and, at times, were prompted to assume liabilities they could not meet." *Id.* Then Under Secretary of the Treasury, Joseph Barr, told a Senate subcommittee that "such blind economic activity is inconsistent with the efficient functioning of a free economic system such as ours, whose ability to provide desired material at the lowest cost is dependent upon the asserted preferences and informed choices of consumers." *Id.*

29.     "The Truth in Lending Act was designed to remedy" this lack of transparency in the provision of credit products. *Id.* As stated in a report by the House Committee on Banking and Currency: "By requiring all creditors to disclose credit information in a uniform manner, and by requiring all additional mandatory charges imposed by the creditor as an incident to credit be included in the computation of the applicable percentage rate, the American consumer will be given the information he needs to compare the cost of credit and to make the best informed decision on the use of credit." H.R. Rep. No. 1040, 90th Cong., 1st Sess., 13 (1967).

30.     In line with its legislative history, TILA's stated purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a).

31.     Although TILA has a role in ensuring the informed use of credit, its purpose and reach are limited in at least three important ways. *First*, TILA's disclosure requirements are applicable only to "creditors," defined in relevant part in the statute as "a person who regularly

extends . . . consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required." 15 U.S.C. § 1602(g). "Credit," in turn, "means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."[1] 15 U.S.C. § 1602(f). The right to defer payment, an essential element of credit, is present in numerous products typically thought of as "credit." A financial institution that issues a home loan, for instance, may not demand repayment of principal from the customer until a certain contractually-prescribed period has passed. In exchange for the risk these financial institutions undertake in extending credit, they typically perform underwriting to assess the customer's creditworthiness before agreeing to loan the funds, and then execute a separate credit agreement.

32. *Second,* TILA's limitation on what constitutes "credit" affects which charges must be disclosed as "finance charges," defined under TILA as "the sum of all charges, payable directly or indirectly by the person *to whom credit is extended,* and imposed directly or indirectly by the creditor as an *incident to the extension of credit.*" 15 U.S.C. § 1605(a) (emphasis added). Annual fees, interest, penalty fees, appraisal fees, and origination fees are all examples of finance charges. As courts have recognized, "[t]he concern behind" TILA's requirement that lenders disclose finance charges is "that a lender might try to make the interest rate look lower than it really is by charging part of the interest in the form of fees for services rendered in connection with the closing of the loan." *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 940 (7th Cir. 1995).

33. *Third*, TILA's general purpose is to regulate *disclosure* of credit terms, and is not to impose substantive restrictions on the manner in which credit is offered, an area traditionally

---

[1] Notably, the limitations on what constitutes a "creditor" do not apply to "card issuers" for purposes of many of TILA's requirements; thus, "the term 'creditor' shall also include card issuers whether or not . . . the payment of a finance charge is or may be required." 15 U.S.C. § 1602(g).

regulated under state law.  In the process of drafting TILA, the Senate Banking Committee explained that TILA would "not in any way regulate the credit industry" or seek "to impede or retard the growth of consumer credits," S. Rep. No. 90-392 at 1–2 (1967), while the House Banking Committee report similarly noted that TILA "provides for full disclosure of credit charges, rather than regulation of the terms and conditions under which credit may be extended," H.R. Rep. No. 90-1040, at 7 (1967).

34.    In the more than 50 years since TILA's enactment, courts have continued to "ma[ke] clear that TILA provides for full disclosure of credit terms rather than regulation of the terms or conditions under which credit may be extended."  *PayPal, Inc. v. CFPB*, 512 F. Supp. 3d 1, 11 (D.D.C. 2020) (citation omitted) (collecting authorities), *rev'd in part on other grounds*, 58 F.4th 1273 (D.C. Cir. 2023); *accord Ngapey v. CMC Mortg., Inc.*, 2024 WL 3624331, at *6 (D. Me. July 31, 2024) ("TILA is only a disclosure statute and does not substantively regulate consumer credit but rather requires disclosure of certain terms and conditions before consummation of a consumer credit transaction.").  Accordingly, TILA "does not mandate federal 'price controls' with respect to credit" and "does not substitute as a federal usury statute."  Board Amicus Brief filed in *Aronson v. Peoples Nat. Gas Co.*, 180 F.3d 558 (3d Cir. 1999), 1999 WL 33631856, at *12.

35.    TILA's limited scope as a disclosure law is reflected in its grant of authority to the CFPB, which extends no further than what is "necessary and proper to effectuate [TILA's] purposes," 15 U.S.C. § 1604(a), those purposes being limited to "assur[ing] a meaningful disclosure of credit terms" in order to protect consumers from "inaccurate and unfair credit . . . practices," *id.* § 1601(a).  Indeed, "courts have consistently read TILA as a disclosure statute—not a statute that allows the bureau to substantively regulate credit."  *PayPal*, 512 F. Supp. 3d at 11.

(In *PayPal*, the CFPB did not appeal the district court's decision that it lacked the authority to impose substantive restrictions on prepaid accounts even while appealing other aspects of that decision.)

**B.    Overdraft Services**

**1.    Overview**

36.    The Final Rule seeks to regulate, under TILA, discretionary overdraft services offered by Very Large Financial Institutions to depositors.

37.    Such discretionary overdraft services, termed by the CFPB as "currently non-covered overdraft credit," are by far the dominant type of overdraft service currently offered by financial institutions.

38.    Discretionary overdraft services are just that—*discretionary*.  The CFPB has acknowledged that for this type of overdraft service, "the financial institution typically pays overdrafts up to certain limits but does not agree in advance to pay the overdrawn transactions, reserving discretion to decline any given overdraft transaction." Final Rule at 11.  As has been the case for decades, there is typically no separate agreement governing the financial institution's provision of discretionary overdraft services.  Instead, discretionary overdraft services are addressed in the depositor's account agreement, along with the financial institution's standard set of deposit account services.  As the CFPB concedes, the account agreement does not require the financial institution to cover overdrafts and makes clear that the financial institution "reserve[s] discretion to decline any given overdraft transaction."  *Id.*  In fact, the CFPB's overdraft debit card coverage Model A-9 form appended to Regulation E uses the very same discretionary language that is in most financial institutions' overdraft terms:  "We pay overdrafts at our discretion, which means we <u>do not guarantee</u> that we will always authorize and pay any type of transaction."  Appx. A-9 to 12 C.F.R. § 1005.17 (Model Consent Form for Overdraft Services).

39.    In cases where the financial institution exercises its discretion to pay the overdraft, it "typically assesses a flat fee for each overdraft transaction [it] pays."  Final Rule at 11.

40.    Under most account agreements, the financial institution reserves the right to immediately recoup the costs of the overdraft and accompanying fee—and in fact the CFPB notes that "institutions typically obtain repayment . . . by immediately taking any incoming deposit to the asset account."  89 Fed. Reg. at 13,872; *see also id.* at 13,854 ("[The financial institution typically deducts [the overdraft fee] as a lump sum from the consumer's next incoming deposit(s)."); Final Rule at 100, 177, 186.  The depositor, in other words, has no right to defer payment of the overdraft that the financial institution covered or the fee the financial institution imposed.  Financial institutions recoup this overdrawn amount automatically, with their customers' knowledge, by treating the account balance as one running balance, cycling between positive and negative as the customer conducts transactions.

41.    Unlike most forms of credit, which are typically available only upon a separate application and proof of income or other demonstration of ability to repay, discretionary overdraft services lack the "hallmarks of an extension of credit," *Fawcett v. Citizens Bank, N.A.*, 919 F.3d 133, 139 (1st Cir. 2019), and are typically provided as a standard benefit to checking account customers at varying limits depending upon factors such as account type and the customer's individual banking history, *see* Final Rule at 12 ("[F]inancial institutions typically assign each account an overdraft coverage limit, . . . . which may be static (i.e., the financial institution assigns an unchanging limit to each customer) or dynamic (i.e., the financial institution changes the limit for each account periodically based on account usage patterns, market conditions, or account and accountholder characteristics).").

42.    As the Bureau acknowledges, discretionary overdraft services differ from what the CFPB terms "covered" overdraft services such as overdraft lines of credit, which "enables consumers to link a checking account to a credit account . . . from which funds are transferred automatically to pay transactions when the checking account balance is insufficient to pay them." *Id.* at 10.

43.    Unlike the more commonly used discretionary overdraft services, overdraft lines of credit resemble other types of credit services such as credit cards, and thus involve a formal application, a separate credit agreement, and underwriting.[2]  Once approved, a creditor cannot exercise its discretion in denying a borrower's request to access the line of credit.

44.    Under the terms of a typical contract for an overdraft line of credit, "an interest rate [is] applied to the outstanding balance" and "[r]epayment of the overdrawn amount and interest is typically made periodically according to a payment schedule."  Final Rule at 9–10.

45.    "The ability to obtain and use covered overdraft credit is typically limited to consumers whose credit history allows them to qualify for an overdraft line of credit or who have available credit on a credit card."  *Id.* at 11.  Accordingly, consumers with limited or poor credit history or who lack substantial income or other assets may not qualify for this type of credit product.  According to a survey by the Independent Community Bankers of America, less than half (41.6%) of checking account customers are eligible for an overdraft line of credit.[3]  These credit products have long been regulated without controversy under Regulation Z.

---

[2] *See* National Credit Union Administration, Overdraft Courtesy Pay Programs, https://ncua.gov/regulation-supervision/letters-credit-unions-other-guidance/overdraft-courtesy-pay- ("Unlike traditional lines of credit, non-contractual overdrafts do not require individual underwriting or written agreements.").

[3] ICBA, Overdraft Payment Services Study, p. 34 (2012), *available at* https://www.icba.org/docs/default-source/icba/solutions-documents/knowledge-vault/icba-surveyswhitepapers/2012overdraftstudyfinalreport.pdf.

46.     Discretionary overdraft services provide significant value to a variety of consumers.  For many consumers, discretionary overdraft services cover charges in cases where they inadvertently failed to maintain a positive balance in their account.  The financial institution's decision to cover the overdraft saves these consumers the inconvenience of having a declined transaction and allows the transaction to proceed, and may also prevent myriad other potentially adverse consequences of missing a payment, including the imposition of late fees, charges for declined transactions, and harm to the consumer's credit score.  Federal Reserve data from 2022 show that between 11% and 26.5% of U.S. adults with bank accounts use discretionary overdraft services.[4]

47.     A smaller but nonetheless substantial number of consumers rely even more heavily on discretionary overdraft services because they otherwise lack access to well-regulated credit products.  A 2017 CFPB study found that 9% of overdraft users had overdrafted more than 10 times per year, accounting for 91% of all overdraft fees paid.[5]  Many consumers who overdraft frequently have poor credit scores or no credit scores at all, and thus disproportionately lack access to credit products such as credit cards that require a separate application and underwriting.[6]  As

---

[4] Consumer Bankers Ass'n, *By the Numbers: How Consumers May be Harmed by CFPB Regulatory Action Limiting Access to Overdraft*, (Dec. 20, 2023), *available at* https://www.consumerbankers.com/cba-media-center/media-releases/numbers-how-consumers-maybe-harmed-cfpb-regulatory-action-limiting, (analyzing data underlying the Federal Reserve Board Survey of Household Economics and Decisionmaking); *see also* Fin. Health Network, *Overdraft Trends Amid Historic Policy Shifts* (Jun. 1, 2023), *available at* https://finhealthnetwork.org/research/overdraft-trends-amid-historic-policy-shifts/ (17% of U.S. households reported incurring either an overdraft or non-sufficient funds fee in 2022).

[5] CFPB, *Data Point: Frequent Overdrafters*, p. 13, Table 1 (Aug. 2017), *available at* https://files.consumerfinance.gov/f/documents/201708_cfpb_data-point_frequent-overdrafters.pdf.

[6] Consumer Bankers Ass'n, *CBA Releases National Empirical Survey Results Showing Consumer Value and Need for Bank Overdraft Products* (Mar. 21, 2024), *available at* https://www.consumerbankers.com/cbamedia-center/media-releases/cba-releases-national-empirical-survey-results-showing-consumer; *By the Numbers*, *supra* n.4 (analyzing data

authors of one recent study concluded, "overdraft alternatives that banks provide [ ] require some form of credit qualification or, in the case of savings-linked overdraft transfers a sufficient savings balance to cover an overdraft.  These are requirements that a large fraction of consumers cannot meet"; those consumers instead "must turn to non-bank lender alternatives" such as payday loans.[7] For many of these consumers, discretionary overdraft services represent the only cost-effective way to pay critical expenses such as rent, and will in many cases consciously elect to pay an overdraft fee because they view the consequences of a declined transaction as worse.

### C.    Regulatory History of Overdraft Services

48.    Prior to the issuance of the Final Rule, the Board and CFPB had properly interpreted TILA and consistently declined to cover discretionary overdraft services under Regulation Z.

49.    Since its original establishment in 1969, Regulation Z has provided, in relevant part, that a fee imposed on discretionary overdraft services, i.e., an item for which the payment was not "previously agreed upon in writing," "is not a finance charge."  12 C.F.R. § 1026.4(c)(3); 34 Fed. Reg. 2002, 2004 (1969).

50.    The Board's decision not to regulate discretionary overdraft services under Regulation Z stemmed from its correct understanding that discretionary overdraft services lacked a credit feature and thus fell outside of TILA's purview.

51.    As described more fully below at paragraphs 80–89, evidence both from around the time of Regulation Z's promulgation and in the decades after demonstrates that the Board

underlying the Board's Survey of Household Economics and Decisionmaking); *Data Point: Frequent Overdrafters*, *supra* n.5, at 25, Table 3.

[7] Curinos, *Competition Drives Overdraft Disruption*, at 34 (2021), *available at* https://curinos.com/insights/competition-drives-overdraft-disruption/.

distinguished between discretionary and non-discretionary overdraft services under Regulation Z based on the former's lack of a credit feature.

52.     In 1981, for example, Board staff commentary provided that while the term "credit card" includes an "asset account . . . tied to an overdraft line [of credit]," it does not include a "debit card with no credit feature or agreement, even if the creditor occasionally honors an inadvertent overdraft." *Truth in Lending; Official Staff Commentary*, 46 Fed. Reg. 50,288, 50,293 (Oct. 9, 1981).  The Board repeatedly reaffirmed its decision not to regulate discretionary overdraft services under TILA and Regulation Z, including as recently as 2009, shortly before regulatory authority shifted from the Board to the CFPB in 2011.  *See* ¶¶ 84–89, *infra*.

53.     The rules governing discretionary overdraft services are instead currently contained in Regulation E, promulgated pursuant to authority in the Electronic Fund Transfer Act ("EFTA"), as well as Regulation DD, the regulation implementing the Truth in Savings Act.  Under Regulation E, a financial institution seeking to impose a fee in exchange for voluntarily covering an overdraft must first provide the consumer a notice "describing the institution's overdraft service," and "[p]rovide[] a reasonable opportunity for the consumer to affirmatively consent, or opt in," to the service for ATM, one-time debit card transactions, checks, and automated clearinghouse ("ACH") transactions.   12 CFR § 1005.17(b).   Regulation DD requires the disclosure of overdraft fees in advertising, at account opening, as well as in the customer's periodic account statement.  12 C.F.R. §§ 1030.4, 1030.6, 1030.11.

54.     "Covered" overdraft products, such as overdraft lines of credit, are currently subject to the disclosure requirements contained in Regulation Z.  12 C.F.R. § 1026.4(c)(3).  Accordingly, financial institutions offering this type of overdraft coverage must disclose terms such as the annual percentage rate ("APR"), interest rates, late payment fees, and finance charges.

**D.    The Final Rule**

55.     The CFPB issued a Notice of Proposed Rulemaking on January 17, 2024, which was published in the Federal Register on February 23, 2024.  *See* 89 Fed. Reg. 13,852 (Feb. 23, 2024) ("Proposed Rule").

56.     After receiving comments from stakeholders, the CFPB issued its Final Rule on December 12, 2024.

57.     The Final Rule covers discretionary overdraft services previously not regulated under TILA and Regulation Z.  In doing so, the CFPB reinterprets key terms in TILA and makes significant amendments to Regulation Z.

58.     *First*, the CFPB contends that discretionary overdraft services fit the definition of "credit" under TILA because "the financial institution has provided the consumer with the 'right' to defer payment of debt or to incur debt and defer its payment, and has therefore extended 'credit' under the plain language of TILA's definition."  Final Rule at 58.  In recognizing that discretionary overdraft fees up until now have not been covered under Regulation Z, the CFPB in the Final Rule adds a new subsection to Regulation Z that covers "overdraft credit," defined broadly to include "any consumer credit extended by a financial institution to pay a transaction from a checking or other transaction account (other than a prepaid account as defined in § 1026.61) held at a financial institution when the consumer has insufficient or unavailable funds in the account."  12 C.F.R. § 1026.62(a).[8]

59.     *Second*, the Final Rule amends Regulation Z's definition of "finance charge" to include fees charged on discretionary overdraft services.  The CFPB adds to Regulation Z's

---

[8] Citations of the Code of Federal Regulations include those that the CFPB has updated in the Final Rule.

example list of "finance charges" any charges imposed on a "covered asset account."  12 C.F.R. §
1026.4(b)(12)(ii).  The Final Rule also modifies Regulation Z's provision excluding from the
definition of "finance charge" overdraft fees not "previously agreed upon in writing," by
appending the language "[t]his paragraph (c)(3) also does not apply to above breakeven overdraft
credit as defined in § 1026.62."  12 C.F.R. § 1026.4(c)(3).

60.     Despite proclaiming that all discretionary overdraft services constitute "credit"
under TILA, and that their accompanying fees constitute "finance charges" under Regulation Z,
the Final Rule regulates only discretionary overdraft fees priced above $5 or the VLFI's
"breakeven cost," and which are imposed by financial institutions with assets exceeding $10
billion.  Final Rule at 6–7.

61.     To establish that its fees are not above "breakeven," a VLFI may either price its fee
at or below the $5 fee cap set forth in the Final Rule or it may calculate its own breakeven cost,
using unduly constrained standards set forth in the Final Rule.  *Id.* at 7.

62.     Under the first approach, a financial institution may not charge above the $5 fee
cap, defined broadly to include not just the financial institution's fee, but also its "combination of
charges," which, in turn, encompasses "all revenue received in connection with an overdraft
transaction, including, but not limited to, any extended or sustained overdraft fees,[9] any interest
charges on outstanding overdraft balances, and any other payments the [VLFI] receives in
connection with an overdraft transaction."  12 C.F.R. § 1026.62(d)(4).  Accordingly, in many
cases, financial institutions choosing to price their discretionary overdraft services at the

---

[9] The CFPB recently noted that a substantial number of large financial institutions continue to
charge sustained overdraft fees.  *See* CFPB, *Overdraft/NSF metrics for Top 20 banks based on
overdraft/NSF revenue reported* (Feb. 2022), *available at*
https://files.consumerfinance.gov/f/documents/cfpb_overdraft-chart_2022-02.pdf.

"benchmark" must charge some amount less than $5. In addition, The Final Rule's calculation of the $5 fee cap omits significant costs described below in paragraphs 63–64 associated with providing discretionary overdraft services. Using data collected from only eight VLFIs, the CFPB calculated the $5 fee cap simply by determining the total charge-off losses divided by the number of non-covered overdraft transactions in the relevant dataset. Final Rule at 234–235.

63.     Under the second approach, a fee would be considered above "breakeven" if it "imposes a charge or combination of charges exceeding the average of its costs and charge-off losses for providing non-covered overdraft credit." 12 C.F.R. § 1026.62(b)(1). This occurs when "the charge or combination of charges exceeds the greater of" the pro rata share of the VLFI's "total direct costs and charge-off losses for providing non-covered overdraft credit in the previous year" or (2) the $5 fee cap. 12 C.F.R. § 1026.62(d). The rubric the CFPB establishes for calculating a VLFI's "breakeven" costs virtually ensures that a financial institution's breakeven costs will not represent the actual cost of offering discretionary overdraft services, and by extension, requires virtually all financial institutions to offer the product at a loss.

64.     This result is because the CFPB, in setting forth the methodology used, rigs the "breakeven" cost calculation by inflating the VLFI's charges and deflating the VLFI's actual costs. With respect to charges, as discussed above in relation to the fee cap, VLFIs must consider not only the overdraft fee, but also "all revenue received in connection with an overdraft transaction," including sustained overdraft fees, interest charges on outstanding overdraft balances, "and any other payments the [VLFI] receives in connection with an overdraft transaction." 12 C.F.R. § 1026.62(d)(4).

65.     The CFPB correspondingly takes steps to artificially and inappropriately suppress the cost of offering discretionary overdraft services. As the CFPB explains in the Final Rule, a

VLFI must calculate its cost by "dividing its total direct costs and charge-off losses for providing non-covered overdraft credit to all accounts open at any point during the prior year (the numerator) by the total number of non-covered overdraft transactions attributable to those accounts occurring in the prior year (the denominator)." Final Rule at 123. But when conducting this calculation, VLFIs must include all transactions which could, in theory, result in an overdraft fee, even if one was never charged, *e.g.*, in instances when the fee was waived. This inflates the number of transactions in the denominator, thus suppressing the cost under the CFPB's formula. What is more, the "direct costs" contemplated by the Final Rule do not include general overhead costs or charge-off losses due to unauthorized use, electronic funds transfer errors, billing errors, returned deposited items, or rescinded provisional credit. 12 C.F.R. § 1026.62(d)(4). The CFPB also clarifies that only general overdraft costs directly traceable to a specific offering of non-covered overdraft "credit" (and not also related to any other type of offering) may contribute towards the VLFI's calculation of "breakeven" cost. Thus, for example, a VLFI's general mailing to customers providing information not exclusively related to non-covered overdraft "credit" would not count as a "direct cost." *See* Final Rule at 126–27. In addition, any cost that cannot be documented must also be excluded. *Id.* at 126. Costs related to customer inquiries to a call center, for instance, would not factor into a VLFI's calculation of "breakeven" cost unless the VLFI had a system in place to trace calls related only to provision of discretionary overdraft services. *Id.* at 126–27. These provisions artificially decrease the size of the numerator, which also reduces the cost. This combination of inflating the charges that must be considered and deflating the costs that may be considered essentially guarantees that a financial institution choosing to offer the "breakeven" fee would be doing so at a total net loss.

66.    *Third*, discretionary overdraft services priced above "breakeven" cost would be subject to Regulation Z's requirements applicable to open-end credit products, including calculations of APRs, periodic statements, due date requirements in § 1026.7(b)(11)(i)(A), and account opening disclosures pursuant to §§ 1026.5 and 1026.6.  Final Rule at 7, 29.

67.    *Fourth*, the CFPB relies upon its general rulemaking power in TILA to impose, as part of the Final Rule, new substantive restrictions on the terms under which discretionary overdraft services may be offered.  Beyond imposing a fee cap, the Final Rule states that VLFIs with fees above "breakeven" may no longer structure the overdraft payment (now designated "overdraft credit") and fee (now designated a "finance charge") as a negative balance on a checking account and instead must create a "separate credit account" from which the financial institution would extend "covered overdraft credit."  Final Rule at 73–74.  The Final Rule thus eliminates a fundamental difference between how discretionary overdraft and overdraft lines of credit operate.

68.    VLFIs that charge above "breakeven" cost *and* that link a checking account to a debit card or other device subject to the Credit Card Accountability, Responsibility, and Disclosure ("CARD") Act are subject to new, additional substantive restrictions and disclosure requirements:

a.    *Compulsory use of preauthorized transfers*.  VLFIs would be subject to the compulsory-use prohibition in Regulation E, which prohibits financial institutions from requiring customers to use preauthorized electronic funds transfers for repayment of above-breakeven overdraft credit.  Final Rule at 8.

b.    *Offsets*.  Regulation Z's prohibition on offsets would apply, meaning that when incoming deposits are made to a customer's account that is overdrawn, the financial

institution would be prohibited from using the deposit to pay off the overdrawn balance. Final Rule at 100.

c. *Prohibition on charging NSF fees*. Discretionary overdraft fees charged under these circumstances would be subject to prohibitions on charging NSF fees[10] for declined debit card or ACH transactions (though not for declined checks).

d. *Ability to pay*. VLFIs must also assess the consumer's ability to repay the credit extended. VLFIs would use the same underwriting standards they use with traditional credit card customers, which would significantly reduce access to services.

e. *Aggregate fee caps*. Under the Final Rule, Section 1026.52(a) of Regulation Z would restrict the amount of certain fees, such as overdraft fees, a VLFI could charge during the first year after opening of a credit account, such as a covered overdraft credit account, to 25% of the consumer's credit limit.

f. *Back-end penalty fees*. VLFIs also face limitations on how much they may charge for "back-end" penalty fees under the Final Rule, such as when a consumer makes a late payment or exceeds their credit limit.

g. *Declined transaction fees*. VLFIs would be prohibited from charging other types of penalty fees such as "declined transaction fees" "where there is no cost to the card issuer associated with the violation of the account agreement." Final Rule at 158.

h. *Allocation of payments*. VLFIs would be subject to the provisions in § 1025.53 "regarding how a card issuer must allocate payments in excess of the minimum periodic payment." Final Rule at 150.

---

[10] "Historically, financial institutions have charged an NSF fee when they reject, rather than pay," an item presented on an overdrawn account. Final Rule at 12.

i. *Grace periods*. Section 1026.54's provisions prohibiting card issuers from imposing a finance charge as a result of the loss of a grace period would also apply.

j. *Fees on outstanding balances*. VLFIs would be subject to the prohibition in § 1026.55 on increases in any APR, fee, or finance charge applicable to any outstanding balance on a credit card account.

k. *Over-the-limit transactions*. VLFIs would not be permitted to impose fees for over-the-limit transactions more than once per billing cycle, pursuant to § 1026.56.

l. *Credit card agreements*. Under § 1026.58, VLFIs would be required to submit credit card agreements to the CFPB on a quarterly basis.

m. *Additional disclosure requirements*. VLFIs are subject to additional disclosure requirements applicable to credit card accounts, including timing requirements in § 1026.5(b)(2)(ii)(A), rate-disclosure requirements in § 1026.6(b)(2)(i)(F), due date disclosure, repayment disclosure, and format requirements for periodic statements as set forth in § 1026.7(b)(11)(i), (b)(12)(i), (b)(13), subsequent disclosure requirements, payments-related disclosures, and timely settlement of estate debts.

69. In addition to TILA's general rulemaking provision in Section 105(a) of TILA (15 U.S.C. § 1604(a)), the CFPB relies on Section 2 of the CARD Act, as well as Section 904(a) of the EFTA, for its purported authority to promulgate the Final Rule. But the changes to TILA and Regulation Z form the Final Rule's foundation, and the Final Rule's CARD Act and EFTA provisions are predicated on those changes, notably the reclassification of discretionary overdraft services as extensions of "credit" under TILA and the corresponding recharacterization of the fees on those services as "finance charges." The parts of the Final Rule based on the CARD Act and

EFTA are, therefore, inextricably intertwined with the Final Rule's core amendments to TILA and Regulation Z.

70.    *Finally*, the CFPB relies on its general authority under the Consumer Financial Protection Act ("CFPA") to prescribe rules "as may be necessary or appropriate to enable the [CFPB] to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof." 12 U.S.C § 5512(b)(1).  But here, too, the CFPB's purported authority ultimately links back to TILA.  As the CFPB explains, TILA is one of the "Federal consumer financial laws" contemplated by the CFPA's rulemaking provision, and thus in promulgating the Final Rule, "the CFPB is exercising its authority under CFPA . . . to prescribe rules that carry out the purposes and objectives of TILA, EFTA, and the CFPA and prevent evasion of those laws."  Final Rule at 34.

## CLAIMS FOR RELIEF

## COUNT I

**Violation of the APA: Exceeds Statutory Authority under TILA – Unlawful Interpretation of "Credit" and "Finance Charge"**

**(5 U.S.C. § 706(2)(A), (C))**

71.    Plaintiffs repeat and reincorporate all of their preceding averments.

72.    Agencies are wholly creatures of statute and thus "an agency's power is no greater than that delegated to it by Congress."  *Lyng v. Payne*, 476 U.S. 926, 937 (1986).  Under the APA, "a reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).

73.    The CFPB exceeds its authority under TILA by regulating discretionary overdraft services as "credit."  TILA defines "credit" as "the right granted by a creditor to a debtor to defer

payment of debt or to incur debt and defer its payment."  15 U.S.C. § 1602(f).  As the CFPB concedes, financial institutions retain contractual discretion to decline charges on an overdrawn account.  Final Rule at 11.  Depositors thus lack the "right" to "incur debt."  Financial institutions that provide discretionary overdraft services also do not confer upon depositors the "right" to "defer payment of debt," an element of "credit" under TILA.  15 U.S.C. § 1602(f).  Instead, as the CFPB notes, "institutions typically obtain repayment of a consumer's negative overdraft credit balance by *immediately* taking any incoming deposit to the asset account."  89 Fed. Reg. at 13,872 (emphasis added); *see also* Final Rule at 100, 177, 186.

74. Despite acknowledging these features of discretionary overdraft services, the CFPB nonetheless maintains (incorrectly) that these services constitute "credit" under TILA.  Specifically, the CFPB asserts that "[n]otwithstanding that a financial institution had retained discretion and could have declined an overdraft transaction, when the financial institution nonetheless elects to cover the transaction by extending overdraft funds, then the financial institution has provided the consumer with the 'right' to defer payment of debt or to incur debt and defer its payment, and has therefore extended 'credit' under the plain language of TILA's definition."  Final Rule at 58.  But the fact that the financial institution may voluntarily elect to provide a service does not indicate that the consumer has a corresponding right to receive it.  The CFPB also contends that "[w]hen a financial institution extends overdraft funds that the consumer must pay back upon their next deposit, the institution is allowing the consumer to incur debt with the institution where the payment of the debt is not immediate.  And even though the consumer's next deposit to repay the institution is typically soon (e.g., on the consumer's next payday), TILA's definition of 'credit' does not have an exclusion for short-term repayment periods."  Final Rule at 58–59.  This argument, again, misses the mark because it ignores the essential element of a *right*

to defer payment of a debt, and focuses instead only on the fact of the deferment.  As reflected in the standard terms previously cited at paragraph 38, no such right exists in standard deposit agreements, and the Bureau has identified no contractual or other language providing such a right.

75.    Discretionary overdraft services also lack other well-recognized "hallmarks" of credit.  Consumers wishing to take advantage of discretionary overdraft services, for instance, do not submit credit applications or sign standalone credit agreements.  And financial institutions typically provide discretionary overdraft services as a standard checking account feature to customers at varying limits without verifying the customer's income or assets.

76.    Rather than interest on an extension of credit, the fees associated with discretionary overdraft services are simply service charges imposed for keeping an account open if the account holder overdraws.  *See Fawcett v. Citizens Bank*, N.A., 919 F.3d 133, 139 (1st Cir. 2019) (finding that overdraft fees "may compensate a bank for the service of continuing to hold open an overdrawn checking account").  In this way, discretionary overdraft services constitute a feature of a checking account and their associated fees are imposed by a financial institution as an alternative to closing an account in the event of an overdraft and in exchange for that service.

77.    The CFPB also exceeds its authority by reclassifying the fees imposed on discretionary overdraft services as "finance charges," defined in TILA as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit."   15 U.S.C. § 1605(a).  Because discretionary overdraft services are not "credit," the fees on those services cannot be considered "charges . . . incident to the extension of credit" as required to constitute a finance charge.  Discretionary overdraft fees thus fall outside the statutory definition of "finance charge," and the CFPB's regulation of them as such is *ultra vires* for this separate and independent reason.

78.     Nothing elsewhere in TILA's text, or in its legislative purpose, suggests that the statute covers discretionary overdraft services.  TILA's text is silent on the issue of overdraft services specifically, and discretionary overdraft services fall squarely outside TILA's express definition of "credit."  And regulating *non*-credit transactions like the assessment of discretionary overdraft fees does not serve TILA's purpose of promoting transparency in *credit* transactions.

79.     TILA's legislative history likewise does not support the CFPB's expansive interpretation of the statute's terms "credit" and "finance charge."  The legislative history suggests "credit" is to be construed narrowly and that TILA was not intended to disrupt substantive state credit regulations.  In fact, a draft of the law that ultimately did not go into effect contained a more fulsome definition of "credit" with a lengthy list of example transactions, none of which relate to overdrafts.  S. 5, 90th Cong. § 3(2) (Jan. 11, 1967).  Similarly, in explaining TILA's definition of "finance charge," the Senate Banking Committee report stressed that "[t]he rule followed was to include only those charges clearly incident to credit.  Where there was doubt, the charge was excluded from the definition."  113 Cong. Rec. S7672 (daily ed. June 5, 1967) (statement of Sen. Proxmire).  The report noted that a draft of TILA was revised to "ma[ke] clear that disclosure need only be made to persons 'upon whom a finance charge is or may be imposed.'"  *Id.* at S7673.  "Thus," the report continued, "the disclosure requirement would not apply to transactions which are not commonly thought of as credit transactions."  *Id.*

80.     The Board, too, has consistently declined to view discretionary overdraft services as extensions of "credit" under TILA.  The text of Regulation Z itself expressly provides that a fee on a discretionary overdraft service, i.e., an item for which the payment was not "previously agreed upon in writing," "*is not a finance charge.*"  34 Fed. Reg. at 2004 (emphasis added).

81.    Regulation Z's drafting history and contemporaneous statements by the Board indicate that the absence of a credit feature on discretionary overdraft services informed the Board's decision not to regulate those fees under Regulation Z.

82.    In a 1968 report, the Federal Reserve Board Task Group on Bank Credit-Card and Check-Credit Plans, discussed so-called "check-credit plans" that provided overdraft coverage using a "prearranged line of credit," which the Board viewed "[a]s a form of open-end or revolving credit" and thus "covered under [TILA]."[11]  The Board contrasted a check-credit plan with a financial institution's offer of overdraft coverage "as a service to preferred customers without requiring any formal overdraft application," and observed that "[s]uch cases, of course, do not constitute either a credit-card or a check-credit plan."[12]  Testimony concerning the proposed Regulation Z before the U.S. House Banking Committee in February 1969 similarly emphasized the need to use TILA to regulate "check-credit plans," a "new form of credit which [was] becoming increasingly popular" and had the potential to "subject[] the customer who consented to the check credit plan to an automatic loan of a minimum amount in excess of the amount he has overdrawn his account."[13]

83.    The Board's interpretive decisions around the same period paint a similar picture. In the 1976 issue of the American Bar Foundation Research Journal, law professor and widely-cited author Jonathan Landers observed that "[i]n response to questions about obstetrical services,

---

[11] Federal Reserve Board System Task Group on Bank Credit-Card and Check-Credit Plans, *Bank Credit-Card and Check-Credit Plans*, at 13, 44 (July 1968), *available at* https://fraser.stlouisfed.org/files/docs/historical/frbdal/circulars/frbdallas_circ_19680924_no68-172.pdf.

[12] *Id.* at 13.

[13] Hearing on Consumer Credit Regulations (Truth in Lending Regulations) before the H. Subcomm. on Consumer Affairs of the Committee on Banking and Currency, 91st Cong. 476 (Mar. 6, 1969) (statement of Anthony Z. Roisman on Proposed Regulation Z).

orthodontal services, and college tuition plans, the Board proclaimed in 1969 and 1970 that "these are not credit transactions because," like discretionary overdraft services, "ordinarily payments are roughly coincidental with services rendered" and thus do not confer a right upon the consumer to defer payment as required under TILA.[14]

84.    The Board's statements in years since reinforce this conclusion.    In a 1977 interpretive letter, the Board explained that Regulation Z does not cover "demand deposit accounts *which carry no credit features* and in which a bank may occasionally, as an accommodation to its customer, honor a check which inadvertently overdraws that account." 42 Fed. Reg. 22,360, 22,362 (1977) (emphasis added).   The Board also contrasted an overdraft fee imposed on these "regular demand deposit accounts" with "a fee charged by a bank for honoring a check exceeding the credit limit in a credit agreement," the latter which, it said, "must be considered a finance charge where the bank treats such a transaction as part of the credit plan."  *Id.* at 22,361-62.

85.    In 1979, the Board promulgated Regulation E and suggested that overdraft protection "[i]nvolves an extension of credit" only when there is "an agreement between a consumer and financial institution to extend the credit when the consumer's account is overdrawn."  *Electronic Fund Transfers*, 44 Fed. Reg. 18,468, 18,472, 18,482 (Mar. 28, 1979). Such a written credit agreement is not an aspect of discretionary overdraft services.

86.    In 1981, the Board excluded debit cards with no credit agreement from Regulation Z's definition of "credit card," and in the process made clear that while a credit card includes an "asset account . . . tied to an overdraft line [of credit]," it does not include a "debit card with no

---

[14] Jonathan M. Landers, *The Scope of Coverage of the Truth in Lending Act*, Am. B. Found. Res. J. 565, 615-16 (1976) (citing Fed. Res. Bd. Interpretive Letter Nos. 214, 254, and 262).

credit feature or agreement, even if the creditor occasionally honors an inadvertent overdraft." 46 Fed. Reg. 50,288, 50,293 (Oct. 9, 1981).

87.     In 2005 amendments to Regulation DD, the Board declined to adopt the view of commenters "urg[ing] the Board to cover certain overdraft services under Regulation Z." 70 Fed. Reg. 29,582, 29,583 (May 24, 2005). In doing so, the Board disagreed with the commenters who argued that "[discretionary] overdraft services compete with traditional credit products, . . . all of which are covered under TILA and Regulation Z" and that financial institutions should therefore "provide consumers with the cost of credit expressed as a dollar finance charge and an APR." *Id.* at 29,585.

88.     The Board spoke clearly and at length on the issue in a 2006 amicus brief filed in the Ninth Circuit, in which the Board opposed a private plaintiff's argument that TILA's disclosure requirements should apply to discretionary overdraft fees in part because "a financial institution offering an overdraft protection program other than pursuant to a written agreement . . . is not a 'creditor' with respect to that program." Ex. 1 (Brief for Board of Governors of the Federal Reserve System as Amicus Curiae in response to Court invitation, filed in *In re Washington Mut. Overdraft Protection Litig.*, No. 04-55885 (9th Cir. June 2, 2006) ("2006 Amicus Brief")), at 7. The Board expressed its view that limiting regulation to overdraft products governed by a "written agreement" was appropriate because only in those cases was there an extension of "credit" as defined in TILA. In the Board's words, "[t]he requirement that there be a written agreement is not met simply because there is a deposit account agreement that addresses overdrafts. . . . Rather, there must be an agreement to extend credit through the bank's obligation to pay overdraft items." *Id.* at 7–8. In emphasizing its view that discretionary overdraft services are not "credit," the Board contrasted charges on discretionary overdraft services not subject to Regulation Z with the charges

described in 12 C.F.R. § 226.4(b)(2), which are "imposed on checking accounts when there is a 'credit feature' such as a formal agreement for a credit plan or line of credit." *Id.* at 8. The distinction between "informal" overdraft programs without a written agreement (and thus no credit feature) and "formal overdraft lines of credit where the financial institution agrees in writing to extend credit to cover an overdraft" is what informed the Board's decision "[f]rom the outset" to exclude discretionary overdraft fees from regulation under TILA." *Id.* at 10.

89.     Finally, the Board found discretionary overdraft services to be lacking a "credit feature" when, in 2009, it elected to implement an opt-in requirement for discretionary overdraft services under Regulation E rather than under Regulation Z. In explaining the rule, the Board reasoned that "an accepted access device does not constitute the addition of a credit feature subject to Regulation Z. Instead, the provisions of Regulation E apply, including the liability limitations and the requirement to obtain consumer consent to the service before any fees or charges for paying an overdraft may be assessed on the account." 74 Fed. Reg. 59,033, 59,055 (Nov. 17, 2009).

90.     Congress has ratified the Board's clear, longstanding, and unyielding interpretation of TILA with respect to discretionary overdraft fees. Despite having amended TILA on dozens of occasions since the introduction of Regulation Z in 1969, including through the passage of major legislation such as the CARD Act and Dodd-Frank Act, Congress has left intact the Board's interpretation of TILA as not encompassing discretionary overdraft services.

91.     The Board is not the only agency to have spoken on the legal status of discretionary overdraft services. The Office of the Comptroller of the Currency ("OCC") has similarly opined that discretionary overdraft services are not extensions of "credit" and thus the fees imposed on those services cannot be considered "interest" for purposes of the usury provision in the National Bank Act. *See* 66 Fed. Reg. 34,784, 34,786 (July 2, 2001); *Walker v. BOKF, N.A.*, 30 F.4th 994,

1002–05 (10th Cir. 2022) (summarizing the relevant OCC regulations and interpretive guidance). Instead, the OCC views the fees on discretionary overdraft services as falling into the category of "non-interest charges and fees, including deposit account service charges" that are governed by a different section of the code.  12 C.F.R. § 7.4002(a), (c).

92.    In 2007, the OCC issued Interpretive Letter 1082, in which it explained that "[w]hen the Bank processes an overdraft item and recovers a fee for doing so, . . . the Bank is not creating a 'debt' that it then 'collects' by recovering the overdraft and the overdraft fee from the account.  Rather, the Bank is providing a service to its depositors in accordance with its federal authority under [relevant regulations] and that—pursuant to its deposit agreement with the accountholder—the accountholder has agreed to pay for."  *See* OCC, Interpretive Ltr. No. 1082, 2007 WL 5393636, at *1, *4 (May 17, 2007).  The OCC noted that this type of discretionary overdraft service is different in kind from "a separate overdraft line of credit product, which is not an element of the Banks' routine deposit account service described herein."  *Id.* at *4 n.13.

93.    As recently as 2017, the OCC issued guidance consistent with its 2007 interpretive letter that overdraft fees are not interest because they are not compensation for the extension of credit.  As the OCC put it, "[a] national bank's flat fee charges to deposit customers for checks written without sufficient funds on deposit do not constitute 'interest' limited by 12 U.S.C. § 85.  The fee is a processing fee, not compensation for an extension of credit."  *Activities for National Banks and Federal Savings Associations, Cumulative*, OCC at 41 (Oct. 2017).  The OCC also reiterated its view that discretionary overdraft fees do not constitute debt.  *Id.* at 112.

94.    Courts, both state and federal, have likewise concluded that discretionary overdraft services do not constitute extensions of credit.  *See, e.g.*, *Walker*, 30 F.4th at 1007 (collecting authorities); *Legg v. W. Bank*, 873 N.W.2d 763, 770 (Iowa 2016).  And multiple federal courts

have dismissed TILA claims predicated on the argument advanced here by the CFPB that TILA encompasses discretionary overdraft services and their accompanying fees. *See Soto v. Bank of Lancaster Cnty.*, 2010 WL 1257666, at *2 (E.D. Pa. Mar. 30, 2010); *In re Washington Mut. Overdraft Protection Litig.*, 539 F. Supp. 2d 1136, 1149 (C.D. Cal. 2008).

95.     As demonstrated above, the CFPB's interpretation of TILA contravenes its plain text, as has been interpreted for decades by the Board, the OCC, and federal courts, and finds no support in TILA's purpose or legislative history. For these reasons, the promulgation of the Final Rule was in excess of statutory jurisdiction, authority or limitations.

96.     The Bureau claims that "if the $5 benchmark in § 1026.62(d)(1)(ii) is overturned, the breakeven method under § 1026.62(d)(1)(i) will remain in effect." Final Rule at 251. But the legal infirmities set forth in this Complaint undermine the entirety of the rule, including both the fee cap and "breakeven" provisions. Thus, setting aside the Final Rule would invalidate each of these provisions.

97.     The CFPB's lack of authority for its Final Rule takes on heightened significance in light of the Final Rule's sizable political and economic impact. Under the "major questions" doctrine, courts must "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 597 U.S. 697, 723 (2022) (quotations omitted).

98.     The economic and political impact of the Final Rule is significant. Discretionary overdraft services have become a consumer mainstay and a standard offering at most financial institutions. Accordingly, the Final Rule will likely impact nearly everyone with a deposit account at a VLFI—totaling hundreds of millions of Americans and billions of dollars of transactions. The Final Rule is also part of the CFPB's highly politicized and publicized campaign against so-called "junk fees," Final Rule at 27 n.9 (collecting CFPB blog posts and publications); 89 Fed. Reg. at

13,859 n.87 (same), and thus resembles other politically charged rules the Supreme Court has recently scrutinized under the "major questions" doctrine, *see, e.g.*, *Ala. Ass'n of Relators v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (striking down CDC eviction moratorium during pandemic).  Changes in how VLFIs handle overdrafts, moreover, will reverberate throughout the banking industry, thereby also affecting non-VLFIs that charge overdraft fees.

99.    All told, the Final Rule's legal, economic, and political impact is immense and requires clear authorization from Congress.  None exists.  TILA's text on its face does not authorize the CFPB to regulate discretionary overdraft services, and certainly lacks the "exceedingly clear language" necessary to authorize the kind of fundamental policy shift the CFPB seeks to bring about here.  *Id.*

### COUNT II

### Violation of the APA: Exceeds Statutory Authority under TILA – Imposition of Substantive Credit Restrictions

### (5 U.S.C. § 706(2)(A), (C))

100.    Plaintiffs repeat and reincorporate all their preceding averments.

101.    Even if the CFPB had the authority to regulate discretionary overdraft services under TILA (which, for the reasons discussed above, it does not), the CFPB has nonetheless exceeded its statutory authority by imposing, as part of the Final Rule, substantive limitations on the terms under which discretionary overdraft services may be offered.

102.    Those numerous substantive terms include, most obviously, the limitations on the amount of the fee that may be charged for provision of discretionary overdraft services, as well as the creation of separate "credit accounts" for overdraft balances.

103.    The CFPB lacks the authority to prescribe these types of substantive rules under TILA.  The CFPB's regulatory authority under TILA is limited to prescribing regulations that are "necessary or proper to effectuate [TILA's] purposes."  15 U.S.C. § 1604.  TILA's purpose, in turn, is to "assure a meaningful *disclosure* of credit terms."  *Id.* (emphasis added).  TILA's legislative history makes clear that it "provides for full disclosure of credit charges, rather than regulation of the terms and conditions under which credit may be extended.  H.R. Rep. No. 90-1040 at 7 (1967); *accord* S. Rep. No. 392, at 1 (1967) (similar).  Indeed, "courts have consistently read TILA as a disclosure statute—not a statute that allows the bureau to substantively regulate credit."  *PayPal*, 512 F. Supp. 3d at 11.

104.    Moreover, the Board has recognized that, as "a cost disclosure statute," TILA "does not mandate federal 'price controls' with respect to credit" and "does not substitute as a federal usury statute."  Board Amicus Br., 1999 WL 33631856, at *12.[15]  The definition of "credit" in TILA makes no suggestion that a service is considered to be credit based on the associated fee pricing.  And no other provision in TILA suggests the CFPB possesses the authority to impose price caps or otherwise dictate the price at which credit may be offered.

105.    While Congress has added certain substantive provisions to TILA since its enactment,[16] those substantive provisions do not permit the CFPB to impose substantive credit

---

[15] *Accord King v. Police & Fire Fed. Credit Union*, 2019 WL 2226049, at *14 (E.D. Pa. May 22, 2019) ("What TILA does not do is 'tell banks how much interest they may charge or whether they must grant a consumer loan.'") (quoting Office of the Comptroller of the Currency fact sheet); Mark Furletti, Federal Reserve Bank of Philadelphia, Discussion Paper, *Credit Card Pricing Developments and Their Disclosure*, at 4 (January 2003) (noting that with respect to credit card accounts, TILA "is primarily disclosure focused" and "is silent about the number amount, variety, or frequency of fees and credit-related charges that issuers can impose," and furthermore "does not suggest ceilings, price controls, or limits for any charges").

[16] *See, e.g.*, 15 U.S.C. § 1637(c)(8) (limiting the availability of credit cards to youthful customers under the age of 21); 15 U.S.C. § 1666i-1 (imposing limits on the timing of increases

restrictions under TILA's general rulemaking authority, as the CFPB does here. These substantive provisions in TILA furthermore demonstrate that, when Congress wants to add substantive limitations on the extension of credit in TILA, it does so expressly through the amendment process.

106.    The CFPB also relies upon purported regulatory authority in the EFTA and CARD Act to implement many of the substantive restrictions on discretionary overdraft services under Regulation Z, but those statutes do not provide the authority that the CFPB lacks under TILA. The Final Rule's provisions relying upon the EFTA and CARD Act are predicated upon changes to TILA and the parts of Regulation Z implementing TILA, and thus do not provide an independent basis upon which to uphold the Final Rule's substantive limits on discretionary overdraft services.

107.    For example, the Final Rule's CARD Act-derived limitations on discretionary overdraft fees for accounts linked to a debit card or other device subject to the CARD Act are predicated upon the treatment of discretionary overdraft services as extensions of "credit" under TILA and the corresponding reclassification of fees on those services as "finance charges" under Regulation Z. That is because the CARD Act was enacted "to establish fair and transparent practices relating to the extension of credit." Pub. L. No. 111–24, 123 Stat. 1734 (2009). As discussed, discretionary overdraft services are not credit, and thus cannot be regulated as such under the CARD Act. The Final Rule's CARD-Act derived changes, then, are predicated on the reclassification of discretionary overdraft services as extensions of "credit" under TILA, and thus do not provide an independent basis upon which to uphold the Final Rule's substantive limits.

108.    Even assuming the CARD Act applied with full effect to the provision of discretionary overdraft services, it does not confer the authority to create fee caps for discretionary

---

in credit card interest rates); 15 U.S.C. § 1637(j) (banning "two-cycle" billing for credit card customers).

overdraft services.  Under the CARD Act, the CFPB may regulate "penalty fees" and "rate increases," *see* 15 U.S.C. § 1665d (penalty fees); *id.* § 1666i-1 (rate increases), but overdraft fees are neither of these things, and the Final Rule does not claim otherwise.  Far from imposing a penalty, discretionary overdraft services are optional, and provided in exchange for the benefits of avoiding a declined transaction that, on average, is substantially larger than the overdraft fee.

109.    The portions of the Final Rule covered by the EFTA are even more limited and discrete, and likewise depend on foundational changes to TILA and Regulation Z.  As noted in the CFPB's Proposed Rule, the CFPB's new EFTA-based prohibition on offsets and corresponding requirement that a VLFI "offer the consumer at least one alternative repayment option in addition to a preauthorized [electronic funds transfer]" come into effect only when "a very large financial institution *provides overdraft credit that is subject to Regulation Z.*"  89 Fed. Reg. at 13,874 (emphasis added).  Nothing in the Final Rule's changes to Regulation E provides a basis to assert regulatory authority over discretionary overdraft services.

110.    By promulgating an elaborate and substantive regulatory scheme governing discretionary overdraft services, the CFPB has gone "beyond the bounds of its statutory authority." *Util. Air. Regulatory Grp.*, 573 U.S. at 326 (citation omitted).  *Michigan v. EPA*, 576 U.S. 743 (2015), makes it clear that a "necessary or appropriate" provision in an agency's authorizing statute, such as the one at issue here, does not empower the agency to pursue rulemaking that is not otherwise authorized by Congress.

111.    Moreover, for questions of political and economic significance, the Supreme Court, construing the "major questions" doctrine, has held that a "merely plausible textual basis for the agency action" is not enough; "the agency instead must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 597 U.S. at 723.  Even if the Final Rule's substantive

regulation of discretionary overdraft services as "credit" could be understood as consistent with the authority conveyed by TILA—and again, it cannot—its promulgation would be a clear example of economically and politically significant agency action taken in the absence of the requisite "clear congressional authorization."  *See id.*

112.    The legal deficiencies identified in this Claim support invalidating the entirety of the Final Rule rather than only portions of it.

## COUNT III

### Violation of the APA: Exceeds Statutory Authority under CFPA

### (5 U.S.C. § 706(2)(A))

113.    Plaintiffs repeat and reincorporate all their preceding averments.

114.    The CFPB also exceeds its authority under the CFPA by imposing an unlawful fee cap on discretionary overdraft fees.

115.    As set forth above, the Final Rule imposes a complex and burdensome set of regulatory restrictions on overdraft services priced above $5 or the VLFI's truncated "breakeven" cost.  These restrictions, to name a few, include creation of a separate credit account, calculation and disclosure of APR, creation and distribution of monthly statements, mandatory ability-to-pay determinations, and prohibitions on the charging of certain fees such as NSF fees.  The cumulative effect of these myriad substantive restrictions is to fundamentally alter the nature of the overdraft service being offered, such it more closely resembles an overdraft line of credit.  No longer would VLFIs be able to offer at above breakeven cost what consumers recognize today as discretionary overdraft services.  If VLFIs want to continue charging above their breakeven cost, they would have to cease offering these types of discretionary overdraft services and instead offer some variation of an overdraft line of credit, a fundamentally different product with fundamentally different features.  The Final Rule, therefore, imposes a fee cap on the types of discretionary

overdraft services currently offered in the market.  To continue offering these services, VLFIs are now forced to charge at or below their "breakeven" cost; if VLFIs wish to charge above breakeven cost, they must offer an entirely different type of program.

116.    The CFPA prohibits this kind of fee cap.  Under the CFPA, the CFPB is prohibited from "establish[ing] a usury limit applicable to an extension of credit offered or made by a covered person to a consumer."  12 U.S.C. § 5517(o).  The Final Rule contravenes this provision in the CFPA by reclassifying discretionary overdraft services as "credit" and then prohibiting VLFIs from offering those same services above a certain price.

117.    The legal deficiencies identified in this Claim support invalidating the entirety of the Final Rule rather than only portions of it.

## COUNT IV

## Violation of the APA: Arbitrary and Capricious

## (5 U.S.C. § 706(2)(A))

118.    Plaintiffs repeat and reincorporate all their preceding averments.

119.    In addition to lacking a valid legal basis, the Final Rule is arbitrary and capricious. First and foremost, the CFPB failed to conduct a valid, statutorily-required cost-benefit analysis, which would have shown the significant negative impacts of the Final Rule on economically disadvantaged borrowers.  In addition, the CFPB failed to provide adequate justification for its legal interpretations and policy choices, and failed to adequately analyze or support several key exclusions from the Final Rule.

### A.    The Final Rule contains an inadequate cost-benefit analysis

120.    When engaging in rulemaking, the CFPB must consider "the purpose of ensuring that all customers have access to markets for consumer financial products and services."  12 U.S.C. § 5512(b)(A)(i).  The CFPB similarly must consider "the potential benefits and costs to consumers

and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule." *Id.*

121.    The CFPB acknowledges numerous ways in which the Final Rule could harm consumers, including as the result of a potential reduction of access to overdraft services, but does not quantify those harms to determine if they outweigh the Final Rule's purported benefits.

122.    For example, the CFPB observed that its Rule could "in principle" result in at least some frequent overdraft users losing access to overdraft services and deposit account services more generally, but cites a lack of data demonstrating the likelihood of this occurring.  Final Rule at 221.  As described below, however, the data were available, but simply ignored.  The CFPB did nothing to estimate (i) the size of the group or (ii) the harm this group would incur if it lost access to these services.  At the same time, the CFPB speculates that lower-income depositors may benefit from a reduction in access to discretionary overdraft services because they would be charged fewer overdraft fees.  The CFPB further postulates that "[l]imited access to non-covered overdraft could be beneficial to consumers with access to cheaper credit options," but declines to explain how large this group would be or what those cheaper credit options would look like.  *Id.* at 222.  Similarly, the CFPB acknowledges that "[t]hose disadvantaged consumers who are not offered any overdraft credit at all will benefit from avoiding the harms associated with today's non-covered overdraft credit and from using alternative forms of credit that are more beneficial (less harmful) to them to the extent available."  *Id.* at 196.  Yet the CFPB does not say what these purportedly less harmful forms of credit are and to what extent they would be available to these financially vulnerable consumers.

123.    The CFPB's so-called "cost-benefit" analysis is fundamentally deficient because it failed to consider available evidence directly relevant to the analysis it purported to undertake.  For

instance, the CFPB ignored the warning from the ABA that "[i]f finalized as proposed, banks will stop offering or sharply restrict access to overdraft services, and consumers will lose." ABA Cmt. Ltr. at 10. The CBA echoed this sentiment, noting in its comment letter that "CBA members are clear on one thing: The Proposal will result in fewer consumers having access to overdraft services." CBA Cmt. Ltr. at 2; *see also id.* at 5–7.

124.    This message was borne out by the CBA's survey of its members, in which 12 out of 13 (or 92%) "indicated that any of the CFPB's proposed overdraft fee caps would materially reduce the amount of overdraft-related liquidity they are able to offer to consumers."[17] The CBA's survey revealed that if the CFPB were to cap discretionary overdraft fees at $7, four banks would have to reduce overdraft liquidity by 76% to 100% (more than any other option). At $3, most banks responding to the query (6 out of 10) would have to reduce overdraft liquidity by 76% to 100%. The average number of overdraft consumers served in 2023, of the respondents that provided such totals, was 1.7 million customers.[18]

125.    In addition, in a survey of credit unions submitted by America's Credit Unions ("ACU"), 93% of respondents that provide free checking reported being impacted in some way by the Proposed Rule, with 13% stating they would end free checking accounts altogether. ACU Cmt. Ltr. at 7. These percentages jumped to 97 and 14, respectively, among the low-income credit unions surveyed. *Id.* The ACU survey demonstrates that the Final Rule will reduce access to deposit services more broadly, a consequence the CFPB likewise disregards.

---

[17] Consumer Bankers Ass'n, *New CBA Survey Illustrates Consumer Harm of CFPB Overdraft Proposal* (Nov. 18, 2024), *available at* https://shorturl.at/917DQ.

[18] Consumer Bankers Ass'n, *Survey of Major Retail Banks*, at 3 (Nov. 14, 2024), *available at* https://consumerbankers.com/wp-content/uploads/2024/11/OD-Impact-Survey-Results.pdf.

126.    The CFPB also incorrectly claims that it lacked data from which it could fairly quantify the harm the Final Rule will likely cause customers who would lose access to overdraft services.  Evidence on this issue *does* exist and *was* available to the CFPB.  Instead of analyzing that data, the CFPB ignored it, absent any valid justification for doing so.  For instance, both common sense and available data suggest that a large percentage of frequent users of discretionary overdraft services would lose access to those services.  The Final Rule would require that VLFIs determine a consumer's "ability to pay" before opening a "covered overdraft credit account" if that account may be accessed by a debit card or other device subject to the CARD Act.  Final Rule at 8.  In a 2024 survey, 72% of customers reported using a debit card at the point of sale, higher than all other payment methods.[19]  To conduct the required underwriting, VLFIs would employ the same assessment tools they currently use for consumers applying for credit cards or overdraft lines of credit.  Those who could not get approved for a credit card or overdraft line of credit would be unable to access covered overdraft credit under the terms of the Final Rule.

127.    Substantial data demonstrate that consumers who use discretionary overdraft services the most would be the ones least likely to qualify for covered overdraft products.  The CBA's 2023 nationwide survey found that 60% of consumers who used overdraft services between one and three times in the past 12 months also reported having a credit card application denied.[20]  This percentage increased to 67% for customers who overdrafted four or more times in the past year.[21]  The same CBA survey also found that, among consumers who reported having overdrafted

---

[19] J.D. Power, *Debit Cards Still Lead in Customer Satisfaction and Utilization, Even as Use of Digital Wallets Grows* (May 23, 2024), https://www.jdpower.com/business/resources/debit-cards-still-lead-customer-satisfaction-and-utilization-even-use-digital.

[20] *CBA Releases National Empirical Survey*, *supra* n.6.

[21] *Id.*

four or more times in the past year, only 10% were able to use a credit card to meet their short-term liquidity needs if they no longer had access to overdraft services.[22]  And according to the Federal Reserve Board's Survey of Household Economics and Decision Making, 37% of consumers who used discretionary overdraft services at least once in 2022 indicated that they were "not confident" they would be approved if they applied for credit.[23]  This percentage jumped to 54% in the year after.[24]  These data are consistent with the results of a Pew survey showing that "[m]ost overdrafters say they do not have enough credit available on a credit card to cover small expenses, and they also say they have weak credit scores."[25]  Twenty percent of frequent overdraft users identified in a 2017 CFPB study reported having no credit score at all,[26] "suggesting that at least some of the recurring usage may have been driven by consumers' challenges in obtaining traditional forms of credit."[27]  Traditional overdraft lines of credit are likewise unavailable for most frequent overdraft users.  In a survey by the Independent Community Bankers of America, less than half (41.6%) of checking account customers were eligible for an overdraft line of credit.[28]

---

[22] *Id.*

[23] *By the Numbers*, *supra* n. 4 (analyzing data underlying the Federal Reserve Board Survey of Household Economics and Decisionmaking).

[24] *Survey of Household Economics and Decisionmaking*, Fed. Res. Bd. (Aug. 23, 2023), https://www.federalreserve.gov/consumerscommunities/shed_data.htm.

[25] The Pew Charitable Trusts, *Overdraft Does Not Meet the Needs of Most Consumers* (Dec. 20, 2017), *available at* https://shorturl.at/fJK2i.

[26] *Data Point: Frequent Overdrafters*, *supra* n.5, at 25, Table 3.

[27] Michael J. Hsu, Acting Comptroller, Off. of the Comptroller of the Currency, Remarks before the Consumer Federation of America's 34th Annual Financial Services Conference: "Reforming Overdraft Programs to Empower and Promote Financial Health" (Dec. 8, 2021), *available at* https://www.occ.gov/news-issuances/speeches/2021/pub-speech-2021-129.pdf

[28] ICBA, Overdraft Payment Services Study, at 34 (2012), *available at* https://www.icba.org/docs/default-source/icba/solutions-documents/knowledge-vault/icba-surveys-whitepapers/2012overdraftstudyfinalreport.pdf.

128.     Discretionary overdraft services thus represent a critical source of liquidity for consumers who use them the most, and loss of access to those services would cause this group of consumers significant financial harm. The Financial Health Network has shown that "[o]f individuals who reported overdrafting more than 10 times in 2022, 82% were financially vulnerable."[29]  These financially vulnerable consumers rely on discretionary overdraft services as a financial lifeline, and make informed choices about when to use those services to cover large and important expenses such as rent, utilities, car payments, and medical bills when they experience a shortfall in funds.  Researchers with the Federal Reserve have found that, of respondents who overdrew their account in the previous year, 84% knew the fee they were charged.[30]  A 2017 analysis of transaction data from 11 banks showed that the median size of items paid into overdraft was $370,[31] while other similar studies have placed the median size at $198[32] and $369,[33] respectively.  Unsurprisingly, "larger transactions [are] associated with a preference for incurring an overdraft fee," and, according to the Financial Health Network survey, "[a]mong those whose last overdraft was on a transaction greater than $50, nearly three-quarters indicated that they preferred to incur the fee rather than have their purchase or payment declined."[34]

---

[29] *Overdraft Trends Amid Historic Policy Shifts*, *supra* n.4.

[30] Donald P. Morgan & Wilbert van der Klaauw, Fed. Reserve Bank of N.Y., Learning by Bouncing: Overdraft Experience and Salience (Apr. 1, 2024), *available at* https://libertystreeteconomics.newyorkfed.org/2024/04/learning-by-bouncing-overdraft-experience-and-salience/.

[31] G. Michael Flores, *An Assessment of Usage of Overdraft Protection by American Consumers*, at 18 (2017)*, available at* https://www.aba.com/advocacy/policy-analysis/small-dollar-credit.

[32] Curinos, *Competition Drives Overdraft Disruption*, *supra* n.7, at 8.

[33] PYMNTS, *New Report Finds the Average Consumer Is Overdrawn for 9 Days* (Oct. 12, 2023), *available at* https://www.pymnts.com/consumer-finance/2023/new-report-finds-the-average-consumer-is-overdrawn-for-9-days/.

[34] *Overdraft Trends Amid Historic Policy Shifts*, *supra* n.4.

129.    For consumers who rely on discretionary overdraft services for liquidity, losing access to those services would leave them unable to cover important expenses or force them to turn to much costlier and riskier alternatives.  According to results of the CBA's nationwide survey, 37% of frequent overdraft users would turn to paying late on an essential purchase if they lost access to discretionary overdraft services, while 10% would resort to pawning or selling their belongings.[35]  Other frequent overdraft users will be forced to resort to non-financial institution lender alternatives such as payday loans.[36]  As the CFPB has observed, "[f]inancially constrained consumers who do not have access to or cannot quickly obtain traditional credit may turn to high-cost alternative forms of credit," including "payday, auto title, or pawnshop loan[s]."[37]  The CFPB has found that consumers who rely upon payday lending products end up trapped in extended loan sequences that become unaffordable and they experience negative impacts on their credit scores.[38]

130.    The significant value discretionary overdraft services provide for a wide array of consumers is reflected in surveys showing consumers' strong satisfaction with those services.  A October 2024 Morning Consult survey revealed that 69% of consumers find their financial institution's overdraft protection valuable—as compared with only 13% who do not find it valuable, and 80% of those who paid an overdraft fee in the past year were glad their financial institution covered their overdraft payment.[39]  About 70% of those surveyed, moreover, viewed

---

[35] *CBA Releases National Empirical Survey*, *supra* n.6.

[36] Curinos, *Competition Drives Overdraft Disruption*, *supra* n.7, at 34.

[37] CFPB Office of Research Publication No. 2023-9, *Overdraft and Nonsufficient Funds Fees, Insights from the Making Ends Meet Survey and Consumer Credit Panel*, at 36 (Dec. 2023), https://files.consumerfinance.gov/f/documents/cfpb_overdraft-nsf-report_2023-12.pdf.

[38] *See, e.g.*, Payday, Vehicle Title, and Certain High-Cost Installment Loans, 82 Fed. Reg. 54,472, 54,472 (Nov. 17, 2017).

[39] Press Release, ABA Unveils New National Consumer Polling Data on Major Bank Policy Issues (Oct. 29, 2024), *available at* https://www.aba.com/about-us/press-room/press-releases/national-survey-on-major-bank-policy-issues.  Past surveys by Morning Consult returned

overdraft fees as reasonable when considering that large payments like mortgages or rent payments are covered and paid on time or that customers are protected from late or other penalty fees if payments presented on an overdrawn account are covered.[40]  Along the same lines, a different survey by Curinos found that 62% of consumers would reconsider their support for new regulation of overdraft if it limited access to the service.[41]  Customers who are dissatisfied with their financial institution's discretionary overdraft services, on the other hand, may opt out of ATM and one-time debit card overdrafts, and 65% of consumers in the Morning Consult survey understood their right to opt-out (compared with only 7% who mistakenly believed customers cannot opt out).[42]  Of respondents in the Morning Consult survey who are currently enrolled in discretionary overdraft protection, 78% have never seriously considered stopping or getting out of the service.[43]

131.    This high level of consumer satisfaction with the discretionary overdraft services currently available highlights the competitive nature of the market for those services.  In recent years, financial institutions have introduced a number of consumer-friendly innovations offering customers a wide range of options that help ensure that overdraft services provide critical liquidity, while limiting the financial impact to consumers.  Those innovations include accounts with low or no overdraft fees, limits on the number of overdraft fees that will be charged within a designated period, establishment or expansion of de minimis overdraft thresholds before an overdraft fee will

---

results that are very similar to those from the October 2024 survey.  *See* ABA Cmt. Ltr. at 12 n.70 (providing survey results).

[40] *Id.*

[41] Curinos, *Competition Drives Overdraft Disruption*, *supra* n.7, at 12.

[42] Press Release, ABA Unveils Consumer Survey Data on Debit Cards, Overdraft and Other Banking Issues in Play in Washington (March 20, 2024), *available at* https://www.aba.com/about-us/press-room/press-releases/consumer-survey-data-on-debit-cards-overdraft-and-other-banking-issues.

[43] *Id.*

be charged, real-time notice of overdrafts, 24-hour windows to deposit funds and avoid overdraft fees, and many others.  Recent research by the industry consulting firm Curinos "indicates that intense competition in financial services is driving many of the recent changes in overdraft policies and programs."[44]  "The proliferation of overdraft grace balances and changes in posting order practices," for example, "have reduced the number of small purchases that are tied to overdraft," and, as a result, the average size of purchases that trigger overdraft fees has nearly quadrupled from \$50 to almost \$200."[45]

132.    The CFPB's conclusion that "[l]imited access to non-covered overdraft could be beneficial to consumers with access to cheaper credit options" therefore does not apply to frequent overdraft users, who rely on discretionary overdraft services the most and, as a general matter, lack access to other sources of liquidity.  It is also inconsistent with the surveys detailed above demonstrating strong support among consumers for the continued availability of discretionary overdraft services under the terms they are currently offered.

133.    The CFPB's refusal to meaningfully grapple with harms it readily acknowledges could result from its rule is arbitrary and capricious.  The CFPB is required to determine costs "as best it can," and is not excused from analyzing available data.  *Nat'l Cmty Reinvestment Coalition v. CFPB*, 2022 WL 4447293, at *28 (D.D.C. Sept. 23, 2022).

   **B.    The CFPB's unexplained change in its interpretation of TILA is arbitrary and capricious.**

134.    The Final Rule represents a sudden reversal of over 50 years of settled regulatory precedent providing that discretionary overdraft services are not "credit" under TILA and thus are not subject to TILA's disclosure requirements.

---

[44] Curinos, *Competition Drives Overdraft Disruption*, *supra* n.7, at 3.

[45] *Id.*

135.    "An agency changing its course must supply a reasoned analysis." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). "[T]he requirement that an agency provide reasoned explanation for its action . . . ordinary demand[s] that it display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

136.    The CFPB fails this most basic requirement here, as it has provided no explanation for why it now interprets TILA differently than it has been interpreted for the past 50 years or why discretionary overdraft services are any different now than they were in 2009, when the Board last publicly reaffirmed its belief that overdraft fees fall outside of TILA's reach.

137.    In fact, the CFPB goes so far as to deny its interpretation is new at all, asserting in its press release announcing the Final Rule that it is simply closing "the large bank regulatory loophole that exempted overdraft fees as a finance charge."[46]  In the Final Rule, the CFPB claims, without evidence, and in conflict with the Board's express statements, that the Board has viewed discretionary overdraft services as "credit" under TILA since the statute's inception, and that it merely used its regulatory authority to "except" discretionary overdraft fees from the requirements in Regulation Z.

138.    As demonstrated at length above, the Board's statements—both at the time of Regulation Z's initial promulgation and in decades since—demonstrate that it has consistently viewed discretionary overdraft services as lacking a credit feature. *See supra* at ¶¶ 80–89. Furthermore, nowhere does the original proposed or final text of Regulation Z indicate that the Board was using "exception authority" to exclude discretionary overdraft fees from the definition

---

[46] CFPB Press Release, *CFPB Closes Overdraft Loophole to Save Americans Billions in Fees* (Dec. 12, 2024), *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-closes-overdraft-loophole-to-save-americans-billions-in-fees/.

of finance charge when "the payment of the overdraft was not previously agreed upon in writing." The Board appeared to be exercising its interpretive, rather than exemption, authority when it stated that an overdraft fee absent a written agreement "*is not a finance charge*." 34 Fed. Reg. at 2004 (emphasis added). And the exclusion of discretionary overdraft fees is listed in Regulation Z along with other types of charges Congress expressly determined not to be finance charges, including taxes and charges in connection with real property transactions. *Compare id., with* 15 U.S.C. § 1605(d)(3), (e). Finally, when it excluded discretionary overdraft services from the definition of "finance charge," the Board made no mention of "exception authority" and did not invoke its authority in TILA to "prescribe regulations" which "may contain . . . *exceptions* for any class of transactions." 15 U.S.C. § 1604 (1970) (emphasis added). This is in contrast to another rulemaking from the same time period in which the Board made explicit reference to its exemption authority when exempting certain classes of transactions. *See* 33 Fed. Reg. 15,506, 15,516 (Oct. 8, 1968).

139.    What the CFPB now calls "clos[ing] the large bank regulatory loophole"[47] is in fact a radical reinterpretation of TILA, in conflict with the Board's longstanding view that discretionary overdraft services lack a credit feature and thus their associated fees are not finance charges.

140.    Because it operates under an erroneous assumption that discretionary overdraft services have always fallen within TILA's scope, the CFPB makes no effort to provide legal authority for its sudden decision to regulate these services. Instead, the CFPB puts forth purported policy justifications for regulating discretionary overdraft fees under TILA. But policy justifications alone do not satisfy the agency's obligation under the APA's arbitrary-and-capricious

---

[47] *Id.*

standard to provide a reasoned explanation for its substantive regulatory changes.  *See PHH Corp. v. CFPB*, 839 F.3d 1, 44 (D.C. Cir. 2016).

141.    In any case, the CFPB's purported policy rationales do not withstand scrutiny even under the deferential arbitrary-and-capricious standard.  The CFPB asserts three principal market changes warranting a change in policy:  (i) overdraft decisions have become more automated; (ii) overdraft programs have expanded to cover non-check transactions, and (iii) overdraft services have become increasingly profitable.  These asserted market changes were expressly contemplated by the Board as recently as 2009 (and are largely unchanged since)[48] and found insufficient to warrant regulating discretionary overdraft services under TILA.  In its 2009 Regulation E "Opt In" Proposed Rule, the Board observed that "[i]n recent years, many institutions have largely automated the overdraft payment process" and "the service has been extended to cover overdrafts resulting from non-check transactions."  74 Fed. Reg. 5212, 5212 (Jan. 29, 2009).  The Board explained that despite these changes, "[m]ost institutions disclose that payment of overdrafts is discretionary and that the institution has no legal obligation to pay the overdraft."  *Id.*  Accordingly, the Board continued to view discretionary overdraft services as "not covered under

---

[48]    *See* FDIC, *Study of Bank Overdraft Programs*, at ii (Nov. 2008), *available at* https://www.fdic.gov/bank/analytical/overdraft/fdic138_report_final_v508.pdf (in 2006, 76.9% of banks surveyed with assets exceeding $1 billion operated automated overdraft programs); *id.* at 13 (finding that in 2006, "regardless of the overdraft program, more than 80 percent of banks covered all transaction types, including ATM or POS [point of sale]/debit transactions"); *compare* Julianne Pepitone, *Bank overdraft fees to total $38.5 billion*, CNN Money (Aug. 10, 2009), *available at* https://money.cnn.com/2009/08/10/news/companies/bank_overdraft_fees_Moebs/index.htm (annual overdraft revenue across all banks in 2009 exceeded $38 billion), *with* CFPB Data Spotlight, *Overdraft/NSF Revenue in 2023 down more than 50% versus pre-pandemic levels, saving consumers over $6 billion annually* (Apr. 24, 2024), *available at* https://files.consumerfinance.gov/f/documents/cfpb_overdraft-nsf_data-spotlight_2024-04.pdf (reporting $5.83 billion in combined overdraft and NSF fee revenue across all banks in 2023).

Regulation Z if there is no written agreement between the consumer and institution to pay an overdraft and impose a fee." *Id.* at 5212 n.1 (internal parentheses omitted).

142.    Similarly, the Board stated in its 2006 amicus brief that it "[did] not consider automated overdraft programs such as the one at issue here to be distinct from programs in which a financial institution occasionally honors an inadvertent overdraft without an automated program." Amicus Br. at 9.  The Board further observed that it had deliberated on multiple occasions about whether "more automated overdraft payment programs" brought about by "changes in technology," but which still lacked a "separate credit line or agreement," "are sufficiently different from the prior informal arrangements as to require disclosures under Regulation Z." *Id.* at 11.  On each of these occasions, the Board made an "affirmative determination" that discretionary overdraft services "are not covered by TILA and Regulation Z, and instead should be regulated through [the Truth in Savings Act] and Regulation DD." *Id.* at 15.

143.    On the issue of non-check transactions, the Board stated it had been "fully aware of this aspect of overdraft programs" in 2005 when it "reiterated" that discretionary overdraft services "would be covered under Regulation DD rather than Regulation Z." *Id.* (citing 70 Fed. Reg. 29,582, 29,585 (May 24, 2005)).  The Board rejected the precise argument put forth by the CFPB in its Proposed Rule, that "the provision of Regulation Z dealing with overdraft charges relates only to 'traditional courtesy overdraft programs' of the sort in use at the time Regulation Z was initially promulgated." *Id.*  This argument, the Board said, "is belied by the recent regulatory history of this issue," which demonstrated that "informal" overdraft programs "were (and continue to be) distinct from formal overdraft lines of credit where the financial institution agrees in writing to extend credit to cover an overdraft." *Id.*

144.    As the Board has reiterated over the years, discretionary overdraft services, no matter how automated or profitable, are not "credit," and for that reason cannot be regulated under TILA.  None of the CFPB's purported market changes underlying its Final Rule change the characteristics of discretionary overdraft services such that they are now more aptly characterized as "credit" under TILA.  The CFPB's lack of explanation for why that conclusion is unsound from either a legal or factual standpoint is arbitrary and capricious.  An agency reversing a prior policy "must show that there are good reasons for the new policy" and provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, 556 U.S. at 515–16.  The CFPB's failure to provide any new factual or legal justification for its 180-degree change in policy falls well short of this standard.

### C.    The CFPB's $10 billion threshold and failure to consider required statutory factors are arbitrary and capricious

145.    The CFPB's use of a $10 billion threshold, which excludes identical transactions and fees by non-VLFIs, is procedurally deficient because it failed to address the statutory factors in TILA that must be satisfied before the agency excepts or exempts "all or any class of transactions."

146.    As provided in 15 U.S.C. § 1604(a), the CFPB "shall" prescribe regulations to carry out TILA's purpose, but "may provide for such adjustments and exceptions for all or any class of transactions, as in the judgment of the Bureau are necessary or proper [1] to effectuate the purposes of this subchapter, [2] to prevent circumvention or evasion thereof, or [3] to facilitate compliance therewith."  Subsection (f) also provides that "[t]he Bureau may exempt, by regulation, from all or part of this subchapter all or any class of transactions [with certain unrelated exceptions] for which, in the determination of the Bureau, coverage under all or part of this subchapter *does not provide a meaningful benefit to consumers in the form of useful information or protection.*"  15 U.S.C. §

1604(f)(1) (emphasis added).  In order to exempt any category of transactions, the CFPB "shall consider" certain enumerated factors, "and publish its rationale at the time a proposed exemption is published for comment."  *Id.* § 1604(f)(2).  As relevant here, those factors include "the extent to which the requirements of this subchapter complicate, hinder, or make more expensive the credit process for the class of transaction," the importance to the borrower of the credit, related supporting property, and coverage under this subchapter," and "whether the goal of consumer protection would be undermined by such an exemption."  15 U.S.C. § 1604(f)(2)(B), (C), and (E).

147.    In neither its Proposed Rule nor Final Rule did the CFPB attempt to address the enumerated factors in § 1604(f) or analyze whether these enumerated factors support its decision to exempt overdraft fees charged by non-VLFIs.  The CFPB in the past, by contrast, has expressly recognized its obligation to consider these factors when exercising its exemption authority under 15 U.S.C. § 1604(f).  *See* 78 Fed. Reg. 79,730, 79,754-55, 79,798, 80,039 (Dec. 31, 2013) (Integrated Mortgage Disclosures Rule).  The CFPB's failure to consider these factors here is fatal, as "an agency that "disregard[s] statutory factors has not provided a "reasonable and reasonably explained" rule for purposes of the APA.  *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019).  While the CFPB provides a cursory rationale for its exercise of "exception" authority under § 1604(a), its rationale—that excluding smaller financial institutions will "facilitate compliance with TILA" (Final Rule at 45)—is nonsensical.

148.    In any case, TILA's statutory factors (as well as its legislative purpose) do not support the CFPB's chosen distinction between large and small financial institutions, and its $10 billion threshold represents arbitrary line drawing unsupported by any reasoned explanation or rational connection to TILA's purpose of ensuring adequate disclosure of credit terms.  Why is an overdraft fee "credit" under TILA when it is assessed by a VLFI, but not "credit" when it is

assessed by a smaller financial institution?  The CFPB never answers this question.  Had Congress

wished to treat customers of small financial institutions differently for purposes of overdraft, it

would have enacted carveouts or safe harbors to that effect, as it has done with respect to other

regulatory areas within TILA and other statutes.[49]  The distinction drawn by the CFPB between

institutions based on asset size is also likely to have a significant, unstudied economic impact on

the banking industry and its customers.  The CFPB's own evidence shows that "many large

financial institutions have already substantially reduced overdraft fees" and that VLFIs impose

overdraft fees less frequently than smaller financial institutions.  Final Rule at 239.  A May 2023

study published by the CFPB similarly found that while overdraft and NSF fee revenue for large

financial institutions declined substantially, financial institutions with between $2 and $10 billion

in assets "experienced smaller average declines."[50]  Yet with the CFPB's change, it may be that

non-VLFIs will be forced to lower their fees as well to remain competitive, impacting their

economic viability and their ability to continue providing discretionary overdraft services to their

customers.

149.    The CFPB's arbitrary decision to apply a $10 billion threshold, in short, lacks any

basis in law or policy.  The CFPB's real reason for this arbitrary distinction, in all likelihood, was

to attempt to avoid collecting data and conducting a review under the Small Business Regulation

Enforcement Fairness Act ("SBREFA"), a process that would likely have delayed finalization of

---

[49] *See, e.g.*, 15 U.S.C. § 1639d(c)(1) (permitting CFPB to exempt depository institutions and credit unions with less than $10 billion in assets or who issue 1,000 or fewer mortgages annually from certain escrow requirements in TILA); 15 U.S.C. § 1639c(b)(2)(F) (establishing safe harbor for depository institutions and credit unions with less than $10 billion in assets from TILA's ability-to-pay/qualified mortgage rule); 12 U.S.C. § 2803 (exempting depository institutions and credit unions that originated fewer than 500 mortgage loans from the reporting requirements of the Home Mortgage Disclosure Act).

[50] CFPB, *Overdraft/NSF revenue down nearly 50% versus pre-pandemic levels* (May 24, 2023), *available at* https://shorturl.at/NtFQE.

the rule by six to nine months and could have required changes if the Final Rule imposed substantial costs on smaller financial institutions. *See infra* ¶¶ 155–158.

### D. The Final Rule's distinction between discretionary overdraft fees priced above and below $5 or "breakeven" cost is arbitrary and capricious.

150.    The CFPB's decision to regulate only overdraft fees exceeding $5 or a VLFI's "breakeven" cost is yet another instance of arbitrary line drawing.

151.    As an initial matter, the CFPB's line-drawing effort is once again procedurally deficient, as it elected to exclude fee transactions below $5 or a financial institution's unduly constrained "breakeven" cost without addressing the required statutory factors in TILA.

152.    Furthermore, the CFPB's decision to regulate discretionary overdraft fees based on a VLFI's breakeven cost is anomalous and divorced from TILA's statutory purpose. Nothing in TILA suggests that the cost to the financial institution should be the driving force for the disclosure.

153.    The CFPB's proffered justification for excluding discretionary overdraft fees priced below $5 or "breakeven" cost is likewise unmoored from TILA's text and legislative purpose. According to the CFPB, "[a] credit product that produces large amounts of revenue and profit is inconsistent with the concept of providing an additional service as a courtesy because it encourages financial institutions to promote consumers' use of non-covered overdraft credit and/or to calibrate their systems to increase overdraft fee revenue." Final Rule at 101–102. Once again, however, the profitability of overdraft services does not affect their status as "credit" under TILA's definition of that term. And whether an overdraft service is provided as a courtesy is determined not by whether the financial institution profits from the resulting fee, but instead whether it had a contractual duty to pay the overdraft.

154.    The $5 fee cap and "breakeven" threshold selected by the CFPB are arbitrary in yet another way:  they do not adequately account for the actual cost of administering discretionary overdraft services.  As discussed in detail in paragraphs 63–65, they do not account for the actual cost of administering discretionary overdraft services.  The Final Rule lacks the analysis required by the Regulatory Flexibility Act.

155.    Under the Regulatory Flexibility Act ("RFA"), an agency is required to prepare an initial regulatory flexibility analysis and convene a panel of small business representatives when it proposes a rule that will have a direct impact on "small entities."  5 U.S.C. § 603.

156.    The CFPB's contention that it is not required to provide an initial regulatory flexibility analysis is procedurally inadequate because it makes no real effort to analyze whether the rule would impact non-VLFIs.  To avoid providing an analysis under the RFA, the agency must "certif[y] that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities," and provide a "statement providing the factual basis for such certification." 5 U.S.C. § 605(b).  It is well-established that "the APA together with the Regulatory Flexibility Act require that a rule's impact on small businesses be reasonable and reasonably explained."  *Nat'l Tel. Co-op Ass'n v. FCC*, 563 F.3d 536, 540–41 (D.C. Cir. 2009).  The CFPB's statement supporting its certification in the Proposed Rule lacks any factual basis, and thus comes nowhere close to meeting this standard.  Instead, the CFPB provides the conclusory assertion that "[a]s this final rule only applies to financial institutions with more than $10 billion in total assets, it affects no small entities."  Final Rule at 248.  The CFPB's failure to provide the required analysis in the Proposed Rule renders the Final Rule procedurally invalid.

157.    Moreover, application of basic economic principles establishes the likelihood of a direct effect on smaller financial institutions in the form of downward pressure on discretionary

overdraft fees imposed by non-VLFIs.  Put simply, it stands to reason that a dramatic reduction in the amount VLFIs may charge for overdraft fees from between $30 and $37 down to $5 will have a significant, direct effect on the market price of overdraft fees, thus impacting the amount non-VLFIs may charge for those fees, and potentially disrupting non-VLFI customer bases (given that their customers may be incentivized to open accounts with VLFIs to avoid paying higher overdraft fees).

158.    The legal deficiencies identified in this Claim support invalidating the entirety of the Final Rule rather than only portions of it.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for an order and judgment in their favor and against Defendants comprising the following relief:

1.    A declaration that the Final Rule violates the APA, TILA, and CFPA;

2.    An order and judgment holding unlawful, enjoining, and setting aside the Final Rule in its entirety as illegal or otherwise impermissible; and

3.    Any other relief that the Court deems just and appropriate.

Respectfully submitted, this the 12th day of December 2024.

PLAINTIFFS MISSISSIPPI BANKERS ASSOCIATION, CONSUMER BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION, AMERICA'S CREDIT UNIONS, ARVEST BANK, BANK OF FRANKLIN, AND THE COMMERCIAL BANK

By:    s/ *Benjamin M. Watson* (MSB #100078)
        Benjamin M. Watson (MSB #100078)
        Samuel D. Gregory (MSB #104563)

        PLAINTIFFS' COUNSEL

OF COUNSEL:

BUTLER SNOW LLP
200 Renaissance at Colony Park, Suite 1400
1020 Highland Colony Parkway (39157)
Post Office Box 6010
Ridgeland, MS 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) ben.watson@butlersnow.com
(E) sam.gregory@butlersnow.com